**Luther HAYNES and Lenita Haynes, Plaintiffs-Appellants,**

v.

**LOGAN FURNITURE MART, INC., an Illinois corporation, Defendant-Appellee.**

No. 73–1793.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1974.

Decided Oct. 2, 1974.

Rehearing and Rehearing En Banc Denied Oct. 31, 1974.

James O. Latturner, Marthe C. Purmal, Joel Stein, Chicago, Ill., for plaintiffs-appellants.

Joseph M. Solon, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

This is an action for damages brought by Luther Haynes and his wife, Lenita Haynes, alleging that a form retail installment contract of Logan Furniture Mart, Inc. (Logan) which was used by Logan in its installment sales during the period July 1—December 31, 1969, and one of which the plaintiffs had executed on July 24, 1969, violated numerous requirements of Regulation Z, 12 C.F.R. § 226, promulgated by the Federal Reserve Board pursuant to § 1604 of the Commercial Credit Protection Act, 15 U.S.C. § 1601 et seq., commonly known as the Truth in Lending Act. The district court denied the plaintiffs' motion to proceed as a class action, ruling that while the prerequisites of subdivision (a) of Rule 23, Fed.R.Civ.P., were satisfied, the suit was not of a type which could be maintained as a class action under subdivision (b) of that rule.

The district court then held, notwithstanding the fact that the Logan form contract failed to comply with at least nine applicable provisions of Regulation Z,[1] Logan was not liable because of its reliance on the opinion of its legal counsel that the contract complied with the pertinent aspects of the regulation. On this appeal the plaintiffs stressed three particular violations, to which Logan by way of concession responded that these violations were established by the court's order and required no further argument.

## I

A suit may be maintained as a class action if in addition to satisfying the requisites of subdivision (a) of Rule 23, Fed.R.Civ.P.,[2] the action is of a type in which common questions of law or fact predominate and for which a class action is superior to other available means for adjudicating the controversy.[3] In deny-

---

[1]. The trial court found that the defendant "failed to make the specific disclosures required by subparagraphs (b)(2), (b)(3), (c)(2), (c)(3), (c)(5), (c)(7), and (c)(8)(ii) of 12 C.F.R. § 226.8." The trial court further found that the computation of any unearned finance charge in the event of prepayment was not identified, a violation of Section 226.8 (b)(7).

In addition, no disclosure was made that insurance coverage was not required and no affirmative statement was obtained from the purchasers that they desired such insurance, as required by Section 226.4(a)(5).

[2]. Rule 23(a), Fed.R.Civ.P., provides:

"Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impractica-ble, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

[3]. As a theoretical matter, a class action could also be maintained if the requirements of either Rule 23(b)(1) or (b)(2) were satisfied.

This portion of the rule provides that: "[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the

ing the motion to proceed as a class action, the court below ruled that:

> "a class action on this type of claim with liquidated or double damages and attorneys' fees is neither a fair nor an efficient method of adjudicating the controversy, particularly before the validity and interpretation of the controlling statute and regulations have become better tested and settled."

While it is true that trial courts are generally afforded great latitude in determining the fairest and most efficient mode of adjudication when such judgments are predicated on careful factual examination, e.g., City of New York v. International Pipe and Ceramics Corp., 410 F.2d 295, 300 (2d Cir. 1969), the trial court's decision to deny class action status in this case was posited on the legal theory that the procedural device of class actions is incompatible with the substantive ends to which the Truth in Lending Act is addressed. We cannot agree.

The Truth in Lending Act, as this appellation strongly suggests, was a legislative response to a public need to be fairly and honestly apprised of the actual cost of using someone else's money. The Act also, of course, serves the purpose of introducing uniformity among the methods which have been previously employed for the purported objective of stating interest rates. Borrowers and consumers are now hopefully enabled to compare credit terms and to avoid the uninformed and/or misinformed use of credit. If they are to be paying a maximum allowable rate they at least will be doing so on a choice basis predicated on knowledge of what they are doing.

In contrast with the statute's obvious purposes, the modes of enforcement embodied in the Act suggest a complex, somewhat confusing scheme. The Act incorporates both the Senate's reliance on private enforcement, including federal jurisdiction without regard to a minimal amount and an individual incentive to litigation in the form of statutory damages of twice the finance charges imposed in the transaction at issue but not less than $100, plus attorneys' fees and court costs, as well as the House provision for federal administrative enforcement of the Act. However, neither branch of the legislature apparently considered the possibility of class actions in Truth-in-Lending cases. Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336, 343–344 (10th Cir. 1973). More particularly, "Congress never foresaw the problem class actions would present: Multiplication of the individual minimum recovery of $100 by the number of members of a large class makes potential liability astronomical." Note, Class Ac-

---

class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . ."

With respect to Rule 23(b)(1), the trial court in this case ruled: "The determination of the case at bar will not establish incompatible standards of conduct for the defendant, since it has been in substantial compli-

ance with Regulation Z since January 1, 1970 [, . . . and] will not impair the ability of other purchasers to protect their interest by filing their own complaints . . . ." On this appeal, Logan took the position that it had "admittedly" complied since January 1, 1970. The plaintiffs challenge the correctness of this statement, and presumably the court's finding to that effect, by pointing out that later contracts had been challenged in litigation. We need not, however, determine this matter or the applicability of Rule 23(b)(1) because of the basis on which we decide the ultimate issue of the propriety of the class action. Rule 23(b)(2) is patently inapposite, for it pertains only to situations in which money damages are not the relief sought, unlike the instant case. La Mar v. H. & B. Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973).

tions Under the Truth in Lending Act, 83 Yale L.J. 1410, 1411 (1974) (citation omitted).

The seminal case on denial of class action status is *Ratner v. Chemical Bank New York Trust Co.*, 54 F.R.D. 412 (S. D.N.Y.1972). The plaintiff in *Ratner* alleged that the bank had violated the Act's disclosure requirement by failing to show the annual percentage rate on a bank credit card monthly statement, even though no finance charge had been imposed and no interest rate had yet been applied. The alleged class was comprised of 130,000 cardholders, and under the terms of the statute, the bank's potential liability was at least thirteen million dollars. The court rested its holding that a class action was not the superior method for fairly and efficiently adjudicating the controversy on two grounds. First, the court found that the incentive of a class action was unnecessary to enforce the Act because the statute contemplated enforcement by a species of private attorney general and the statutory minimum recovery guaranteed the viability of individual actions and obviated the need for the incentive of a class action to enforce the Act. Second, the aggregate potential liability presented the spectre of a "horrendous, possibly annihilating punishment" for a mere "technical" violation. 54 F.R.D. at 416.

■ Relying on the reasoning in *Ratner*, Logan argues that the Truth in Lending Act's provision of incentives for individual litigation necessarily precludes the use of class actions in such cases. See, Goldman v. First National Bank, (N.D.Ohio 1973) (unpublished order-Ill.1972) ; Roth v. Community National Bank, (N.D.Ohio 1973) (unpublished order). First, as a matter of legislative intent, it is not at all clear that Congress meant to bar the use of class actions in cases brought under the Act. Nothing in the legislative history of the Act or the Act itself expressly or impliedly prohibits the use of the class action. *See generally*, Note, 83 Yale L.J.

1410 (1974). Class actions have been extensively used in antitrust and securities litigation without specific legislative authorization, and Congress was certainly cognizant of the fact that class actions were a part of the existing body of law when the Truth in Lending statute was enacted. We thus concur with the Tenth Circuit's pronouncement in a recent Truth in Lending case, factually similar to *Ratner*, in which class action status was denied: "To find any congressional intent to preclude . . . treatment of such cases under Rule 23 would be a work of clairvoyance and not of construction or interpretation." *Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336, 343–344 (10th Cir. 1973). Second, the argument that the incentive for individual litigation precludes class action litigation assumes that the incentive solely relates to consumer motivation to sue rather than to creditor compliance with the Act. To the contrary, the purpose of enacting the statutory minimum damage provision was as much to induce creditor compliance with the Act as to provide incentives for private litigants. Note, 83 Yale L.J. at 1416. Therefore, "[c]reditors disregarding their responsibilities under the Act and causing damages to members of a class however limited or extensive should have no assurance that their accumulated responsibility cannot be enforced through this means." *Wilcox v. Commerce Bank of Kansas City*, *supra* at 348. Third, while procedural fairness with respect to protecting defendants from crushing damages predicated on the statutory minimum recovery is an important consideration in determining the superiority of the class action mode of adjudication, it is at least equally important to prevent violators of the Act from limiting recovery to a few individuals where actual, wide-spread noncompliance is found to exist.

On balance, class actions might very well be superior to individual suits, because while the former would compel correction of disclosure errors and full collection of damages, the latter would

result only in correction of errors, for collection damages would be sharply restricted by the short statute of limitations (16 U.S.C. § 1640(e)), the inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually. *See generally*, Note, 83 Yale L.J. at 1415–1418.

Further, no particular perceptiveness of modern society is needed for an awareness of a fact of life lying in the virtually perpetual monthly payment program of many families. As balances owing decline new purchases occur. The individual if aware at all of his claim under the Act is bound to have some reluctance to sue in his own name the supplier with whom he continues to do business and one who could be in a position to visit harsh remedies on the buyer in the event of a subsequent default.

Therefore, " . . . we cannot agree that under all the circumstances the class action device necessarily would be incompatible with Truth in Lending cases. Where overriding reasons for preclusion are not present, there seems no reason why the use of this procedural device may not be appropriate and desirable . . . ." Wilcox v. Commerce Bank of Kansas City, *supra* at 347–348.

■■ In evaluating the appropriateness and desirability of class action status in this particular case, we deem it highly significant that here, unlike *Rat-*

*ner* and *Wilcox*, actual damages were alleged. See, Ratner v. Chemical Bank New York Trust Co., *supra*, 54 F.R.D., at 416 n. 7. In the installment sales transactions at issue, Logan Furniture Mart had in fact imposed a finance charge and applied an interest rate. Moreover, because of the nature of the merchandise sold, it is highly likely that the statutory penalty of twice the finance charge would approximate or exceed the statutory minimum recovery in a predominate number of the transactions, as is the case in the Haynes transaction. We note, too, that a class action in this case, involving approximately 2500 purchasers, would be inherently more manageable than the class of 180,000 members proposed in *Wilcox* or the class of 130,000 members suggested in *Ratner* Finally, notice to class members would present little difficulty since consumers are identifiable from the company's installment sales contracts. Under these circumstances, we conclude, notwithstanding several district court opinions to the contrary, that the class action is the superior means of adjudicating the present total controversy and, since it was apparently conceded in the trial court that common questions of law and fact predominate,[4] that it was an abuse of discretion for the trial court to hold otherwise.

II

Though the trial court determined that Logan Furniture Mart's form retail

---

4. Relying on Rodriguez v. Family Publications Service, Inc., 57 F.R.D. 189 (C.D.Cal. 1972), the defendant argues here apparently for the first time that the finding of commonality of questions of law and fact is negatived by the possibility that some purchases were made for commercial rather than personal purposes and that counterclaims will be filed with respect to delinquent accounts. While we need not decide these points at this time, there is no indication that the commercial users of credit at this retail home furnishings establishment are other than minimal in the overall picture. *Cf.*, Katz v. Carte Blanche Corporation, 496 F.2d 747, 762 (3d Cir. 1974). Such commercial purchases would frequently be readily identified by the listing of the name of the busi- ness as the purchaser in the contract. Even if it is necessary to review the contracts individually to eliminate business purchases, as was pointed out in Beard v. King Appliance Co., 61 F.R.D. 434, 438 (E.D.Va.1973), "such a task would be neither herculean, inhibiting, nor for that matter . . . unique." Furthermore, litigation respecting individual counterclaims if successful, would only reduce damage awards; it would not affect a finding of liability. In a similar contex, the *Beard* court commented, "The Court finds that the possibility of subsequent individual suits for actual damages . . . does not substantially detract from the predominance of class issues . . . ." *Id.* at 438–439.

installment contract failed to comply with numerous provisions of Regulation Z, the court found that the furniture company's "principal but not exclusive" [5] reliance on the advice of counsel exculpated it from liability under § 1640(c) of the Act. The trial court reasoned that such reliance on counsel demonstrated that the violations were not "intentional" but resulted from "bona fide error notwithstanding reasonable procedures to avoid the error," within the meaning of § 1640(c). The plaintiffs contend that the court's interpretation of the statute involves an unduly restrictive interpretation of the element of intent while expanding the scope of the term "error" beyond that envisioned by Congress. We agree.

Section 1640(c) provides:

"A creditor may not be held liable in any action brought under this section for a violation of this part if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

■ In reaching its conclusion, the district court necessarily reasoned that intent, as employed in § 1640(c), is directed to the violation of the law itself rather than to acts which constitute violations of the law. In Ratner v. Chemical Bank New York Trust Co., 329 F. Supp. 270, 281 (S.D.N.Y.1971), a case in

which the defendant similarly contended that an error of law was not intentional within the meaning of § 1640(c), the court stated:

"It is undisputed that defendant carefully, deliberately—intentionally— omitted the disclosure in question. That defendant . . . mistook the law does not make its action any less intentional."

The rationale for this result was expressed in Buford v. American Finance Co., 333 F.Supp. 1243, 1248 (N.D.Ga. 1971), where the same argument respecting intent was also raised. The court wrote, "If consumers would be required to prove that creditors were determined to violate the Act in order to prevail, the civil remedy would be a hollow one." *See also*, Owens v. Modern Loan Co., (W.D.Ky.1972) (unpublished order). That these courts' interpretation of intent in § 1640(c) is correct is buttressed by the contextual placement of the section within the Act. The argument that intention in that section relates to violations of the law (*i. e.*, intent to break the law), Welmaker v. W. T. Grant Co., 365 F.Supp. 531, 544 (N. D.Ga.1972), necessarily equates the term with a knowing and willful violation. That, however, is the standard required for establishing criminal liability under the Act, 15 U.S.C. § 1611, and § 1640(c) is by its term directed only to the lesser finding of civil liability.[6] We therefore conclude that "intentional," within the meaning of § 1640(c), describes volun-

---

5. There was apparently uncontroverted evidence to the effect that counsel of the furniture company refused to advise his client respecting the Act's requirement of disclosure that the purchase of insurance is voluntary, a requirement which the company violated. There is further evidence suggesting that counsel did not advise his client that it could, as it did, substitute disclosure of a table of the maximum allowable finance charges under Illinois law for disclosure of the annual percentage rate required by the Act.

6. As Judge Frankel points out in his opinion in Ratner v. Chemical Bank New York Trust Co., *supra* at 281 n. 17:

"The House bill originally required proof of a 'knowing' violation to establish civil liability. This was omitted in the final House version, apparently in response to objections by the Justice Department that to require proof of 'specific knowledge' might 'frustrate prospective plaintiffs, and thereby weaken the enforcement provisions of the act.' Hearings on H.R. 11601. Before the Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency, 90th Cong., 1st Sess., pt. 1, 903 (1967)."

tary, deliberate acts and omissions, including those of the defendant.

Moreover, both the language and the legislative history of the section indicate that exculpation was for matters in the nature of clerical errors and that the "provision is wholly inapposite to deal with errors of law like defendant's though made in entire 'good faith.'" Ratner v. Chemical Bank New York Trust Co., *supra*, 329 F.Supp. at 281–282. We note that a defendant seeking absolution under this section is required to show not merely that his acts or omissions were unintentional, but also that due care was taken to create "procedures . . . to avoid any such error." This obvious reference to internal controls in a law mandating the presentation of many exact figures and percentages unique to each transaction plainly suggests that the scope of the section was intended to encompass basically only clerical errors. Furthermore, the provision was only included in the Senate's bill after complaints were raised that such an act would, in effect, impose strict liability, because clerical and mathematical errors would inevitably result as a consequence of the complexity of annual rate computations. See, Hearings on S. 5. Before the Subcomm. on Financial Institutions of the Senate Comm. on Banking and Currency, 90th Cong., 1st Sess. 64ff., 226, 374, 426–427, 529, 584, 698 (1967); Ratner v. Chemical Bank New York Trust Co., *supra* at 281 n. 17. We find, therefore, that § 1640(c) offers no shelter from liability for the defendant, whose error whether in good faith or not was judgmental with respect to legal requirements of the Act and not clerical in nature.[7]

Accordingly, we reverse the judgment of the district court and remand for further proceedings in accordance with this opinion.

Reversed and remanded.

7. Because of our holding that § 1640(c) is inapplicable to errors of law committed by the defendant, we need not consider the question of whether the defendant sustained its burden of proof in showing that such errors were committed in good faith.