In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 00-2780, 00-2781

ANN L. NIELSEN,

*Plaintiff-Appellee*,

*v.*

DAVID D. DICKERSON, *et al.*,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 5909—**Charles P. Kocoras**, *Chief Judge.*

ARGUED FEBRUARY 12, 2001—DECIDED OCTOBER 9, 2002

Before CUDAHY, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* After receiving a letter from attorney David D. Dickerson advising her that the balance on her GM credit card account was past due, plaintiff Ann L. Nielsen filed a class action suit against Dickerson and others pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. Nielsen asserted that Dickerson's letter, which was sent to thousands of delinquent creditors like her, falsely suggested that an attorney had become actively involved in GM's debt collection efforts, when in fact Dickerson had done little more than lend his name and firm letterhead to the debt collection effort. *See* 15 U.S.C. §§ 1692e(3) and (10), 1692j(a). After certifying a class comprised of all Illinois residents

who had received letters from Dickerson's firm, 1999 WL 350649, Judge Kocoras granted summary judgment in favor of the plaintiffs, 1999 WL 754566. We affirm.

**I.**

**A.**

Household Bank (SB), N.A. ("Household Bank" or the "Bank"), issued GM credit cards to Nielsen and the other class members. The Bank's affiliate, Household Credit Services, Inc. ("Household"), which operated under the trade name "GM Card," serviced the Bank's credit card portfolio by, among other activities, maintaining the individual credit accounts and rendering collection services.

Dickerson is licensed to practice law in Virginia and has done so for more than 30 years. He heads a small firm, David D. Dickerson & Associates, comprised of himself, two other attorneys, and some twenty to twenty-five staff assistants. (We shall refer to Dickerson and his firm collectively as "Dickerson.") For more than 25 years, Dickerson has provided legal services in connection with debt collection activities, and Dickerson has acquired a certain expertise in debt collection law, including the FDCPA. He keeps current on the FDCPA, and seeks to ensure that he and his staff do not violate the statute, by maintaining membership in two debt collection organizations, attending seminars, and reading monthly publications concerning state and federal debt collection law. He also oversees the training of his staff, maintains office manuals outlining debt collection procedures, has his staff review a videotaped presentation regarding the FDCPA, conducts regular meetings with his staff, and, on occasion, has fired employees who deviate from his established collection procedures.

In April 1997, after Dickerson made a presentation to Household about the FDCPA and the types of legal ser-

vices his firm could provide, Household engaged Dickerson to aid it in the collection of delinquent GM Card accounts. Dickerson signed a nine-page Legal Collection Services Agreement pursuant to which he agreed to exercise due diligence and to render legal services consistent with applicable federal, state, and local laws—including the FDCPA. Dickerson had provided legal services to other creditors in addition to Household.

The "legal service" that Dickerson provided to Household pursuant to this agreement consisted primarily of issuing a form "past due" letter—that Dickerson himself had drafted before he was engaged by Household—to delinquent GM Card holders after the firm had performed certain checks on the information supplied to it by Household. By the terms of the agreement, Household approved the initial form of Dickerson's letter and reserved the right to approve any changes thereto. Household itself never suggested any changes to the letter, however.

Periodically, Household would forward to Dickerson a computer disk containing delinquent account data. The data included each debtor's account number, name, address, account balance, and the amount past due. After reformatting the data into its own system, the firm pulled the data up onto a computer screen to check for any obvious gaps or errors in the data. In the absence of such faults, the firm then transmitted the data to Contact U.S.A., a printing and mailing service, which printed a hard copy of the data and sent the hard copy back to Dickerson. Upon receipt of the printed copy, someone in Dickerson's office would stamp the document with a small checklist that Dickerson and his staff would initial to reflect completion of the three-level review of the data that they conducted. Pursuant to that review, the firm made sure that duplicate letters were not sent to the same debtor and also flagged any instances in which Household had provided it with incomplete or inaccurate debtor infor-

mation. The firm also checked the data against an in-house database of recent bankruptcy declarations compiled from bankruptcy notices that it received on a regular basis, in order to stop letters from being sent to debtors who had declared bankruptcy. The firm's computer also checked the data to flag debtors who lived in one of three "prohibited" states—West Virginia, Colorado, and Connecticut—to which Dickerson did not send letters; staff members were also instructed to eyeball the data for these same states as a safeguard against computer error. An attorney conducted the final level of this review and sometimes one of the first two levels. Dickerson himself reviewed nearly all of the printouts of the pertinent data, although his review was admittedly quite brief. (Dickerson indicated that he spent approximately two minutes reviewing a page listing the data on forty overdue accounts, which suggests that he devoted only a few seconds to each account.) Upon completion of the tripartite review, an acknowledgment report listing the debtors to whom a delinquency letter would be sent was forwarded to Household; a separate report also identified any debtors to whom the firm had decided a letter should not be sent based on its review of the data. The firm then waited for at least twenty-four hours before taking any further action, giving Household the opportunity to make corrections. (If Household flagged a mistake in the report, a letter would not be sent to that debtor.) At the expiration of the waiting period, the firm then forwarded the appropriate data to Contact U.S.A., which printed and mailed the letters on firm letterhead with a facsimile of Dickerson's signature.

Beyond checking the Household account data in the manner we have just described, Dickerson did not make an individualized assessment of the status or validity of the debt or the propriety of sending delinquency letters to the account debtors referred to him by Household; nor

was the law firm the only party to perform these checks. Household selected the accounts that were referred to the firm for delinquency letters; and before transmitting an account to Dickerson, Household not only reviewed the pertinent account information, but screened each account for deceased or bankrupt debtors and those who lived in prohibited states. The firm's own review of the referred accounts was confined to the information supplied by Household. Dickerson did periodically review the standard GM Cardmember and Disclosure Agreement; and he had sufficiently familiarized himself with Household's method of handling the GM card portfolio to know generally how long the accounts had been delinquent and what steps Household had taken to collect on those accounts by the time they were referred to him. But Household did not supply Dickerson with a copy of a debtor's file, nor did Dickerson have access to Household's account system. Thus, beyond conducting facial checks of the data he was provided and checking that data to screen out debtors who were bankrupt or who lived in prohibited states, Dickerson relied on Household's judgment as to the validity and delinquency of the debt. Indeed, Dickerson never requested additional information from Household before instructing the mailing service to issue a delinquency letter. Dickerson "assum[ed] that many demands for payment have been made on the debtor and that legal action is contemplated if it appears that these debtors will not pay amicably and have the means to satisfy a judgment," he wrote in the standard letter accompanying the acknowledgment reports he sent to Household. R. 30 Ex. D. "It is understood that these are accurate and valid claims for the amounts stated and that any information indicating that the debtors dispute any part(s) of the debt have been furnished to this office." *Id.* After Dickerson's review of Household's account data was complete and the firm had forwarded the data to Contact U.S.A. for printing and mailing, the mailing service itself performed

a final computerized check of the data to ensure that the letters were sent to the correct addresses and reflected the correct overdue balances and that duplicate letters were not sent to the same debtor.

The letter that Dickerson sent to delinquent GM Card holders stated as follows:

**DAVID D. DICKERSON AND ASSOCIATES**
**A PROFESSIONAL CORPORATION**
**ATTORNEYS AND COUNSELORS AT LAW**

[Firm Address, Telephone Number, and Fax Number]

[Debtor Name and Address]          [Date, Account Number, Balance, and Past Due Amount]

Dear [Debtor]:

My client, **GM Card**, has requested that I write to you concerning your delinquent account.

Unless you dispute the validity of all or part of the debt within thirty days after receiving this notice, the debt will be assumed to be valid by us. However, if you notify us in writing within the thirty day period that all or part of the debt is disputed, we will obtain verification of the debt or a copy of a judgment and mail a copy of such verification or judgment to you. Also, upon your written request within the thirty day period, we will provide you with the name and address of the original creditor, if different from the current creditor. This is an attempt to collect a debt. Any information obtained will be used for that purpose.

If you do not dispute this debt or any portion thereof, please do one of the following:

1.   Make payment to my client **GM Card**, or

2.   Call **GM Card** at **(800) 557-5620 ext. 3740** to discuss payment arrangements.

Very truly yours,

**David D. Dickerson & Associates**

By: [Facsimile signature]

David D. Dickerson, Esq.

R. 11 Ex. A (emphasis in original). A payment coupon addressed to GM Card was attached at the bottom of the letter.

As the text of Dickerson's letter reveals, debtors were advised either to make payment directly to "GM Card" (Household's trade name) or, if they wished to discuss payment arrangements, to call "GM Card" directly at the indicated 800 number. Calls placed to that number were taken by Household's in-house collection personnel, who were instructed to handle the calls themselves and not to refer inquiries to Dickerson. Dickerson's letterhead naturally included his firm's telephone number, however, and the letter did instruct cardholders to notify "us"—presumably meaning Dickerson—in writing if they disputed part or all of the debt. As a result, Dickerson's firm regularly did receive written and telephonic inquires and responses from cardholders and their attorneys. However, he was not empowered to resolve matters on Household's behalf and did not do so. Where a written response was received, a firm employee would generate one of six form transmittal letters to Household highlighting the nature of the response (e.g., the debtor's declaration of bankruptcy, her inability to pay the debt, her dispute of the debt, and so on).[1] Dickerson himself reviewed and

---

[1]  To a very limited extent, certain of these form letters contained generic "advice" to Household as to how it should handle the debtor's response. For example, the form letter used for a response indicating that the debtor had declared bankruptcy reminded

(continued...)

signed each transmittal letter, which was then sent to Household with the debtor's response enclosed.[2] A copy of the transmittal letter, which indicated that the debt- or was to deal with Household directly, was sent to the debtor as well. Telephone calls to Dickerson's office were handled in a similar manner. Such calls were routed to Dickerson himself or, if he was unavailable, to his voice mail. In either instance, debtors were advised to submit a written response. As with the written responses, Dicker- son forwarded the telephonic responses to Household for disposition (often by way of a phone call from Dickerson to a Household employee).[3] Dickerson took no further ac- tion once the responses were handed over to Household. Household never asked Dickerson to pursue a judgment on its behalf, although Dickerson routinely did so for other clients. Household, not Dickerson, handled any requests for verification of the debt.

Thirty days after Household referred a delinquent account to Dickerson, the firm returned the account to House- hold.[4] Household paid Dickerson a flat fee of $2.45 per ac-

---

[1]  (...continued)
Household that federal law required it to cease and desist any further contact with that debtor. *See* R. 46 Ex. C (collecting exam- ples of transmittal letters).

[2] On occasion, if a particular debtor's situation was unique, Dickerson drafted a specific transmittal letter regarding that situ- ation.

[3]  Dickerson testified that when debtors or their representatives (including their attorneys) contacted him by telephone, he at- tempted to answer their questions and to be of assistance to the extent that he could. The record does not reveal the nature of any information or assistance that he may have provided, however.

[4]  Household did not discontinue its own efforts to collect an overdue account—including phone calls to the debtor to solicit
(continued...)

count irrespective of the effect (if any) that his letter had upon the debtor. Dickerson in turn paid Contact U.S.A. ninety-nine cents per letter for its services. Dickerson received approximately 2,000 accounts per month from Household. Dickerson typically spent two to three hours per day working on Household matters, and he performed the bulk of the work done by his firm on such matters.

On or about January 7, 1998, Dickerson sent Nielsen (a Chicago resident) a delinquency letter concerning her GM Card account. As of that date, the balance on her account was more than 120 days past due, and she had not responded to Household's previous attempts to resolve the delinquency. When Nielsen received and read Dickerson's letter, she noted that he was a lawyer and assumed that she might be sued on her unpaid debt. Nielsen did not, however, respond to the letter. Four months after she received it, she declared bankruptcy. The bankruptcy court discharged her debts on August 28, 1998.

**B.**

Nielsen subsequently filed this suit on behalf of herself and other GM Card holders who had received delinquency letters from Dickerson. Judge Kocoras certified a class that included every GM cardholder residing at an address within Illinois to whom Dickerson had sent a letter between September 22, 1997 and July 15, 1999. Informational notices regarding the class suit were sent to some 3,504 individuals. Subsequently, on the parties' cross-motions for summary judgment, Judge Kocoras granted summary judgment in favor of Nielsen.

---

[4] (...continued)
payment on the account—while the matter was pending in Dickerson's office.

At the outset Judge Kocoras determined that Dickerson and Household each qualified as a "debt collector" that could be held liable under the FDCPA for misleading communications with debtors. It was undisputed that Dickerson and his firm regularly engaged in efforts to collect the debts of others. Dickerson thus satisfied the principal criterion for "debt collector" status. 1999 WL 754566, at *3; *see* 15 U.S.C. § 1692a(6). Household, by contrast, had not undertaken to collect anyone's debts but its own, and so would not normally constitute a debt collector under the statute. *See id.*; *e.g.*, *Aubert v. American Gen. Fin., Inc.*, 137 F.3d 976, 978 (7th Cir. 1998). However, pursuant to what is known as the "false name" exception to this rule, a creditor or an affiliate of a creditor who uses someone else's name so as to suggest to the debtor that a third party is involved in the debt collection process, when in fact that party is not involved, can be treated as a "debt collector" under the FDCPA. *Id.*; *see Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 235 (2nd Cir. 1988). Based on his ultimate determination that Dickerson played no genuine role as an attorney in Household's debt collection efforts, Judge Kocoras reasoned that Dickerson's letter to Nielsen and the other class members was in reality from Household, and that Household was simply using Dickerson's name to suggest that he and his firm were involved in the attempt to collect Household's debts. On that basis, Judge Kocoras found that Household should also be treated as a "debt collector" that could be held liable to the extent that Dickerson's letter was false or misleading. 1999 WL 754566, at *3.

The judge then turned to Dickerson's letter and considered whether that letter falsely implied that an attorney had been engaged to help Household collect on the overdue GM Card accounts, in violation of section 1692e(3). Our opinion in *Avila v. Rubin*, 84 F.3d 222, 228-29 (7th Cir. 1996), recognized that a delinquency letter from an attor-

ney conveys authority and implies that the attorney supervised or actually controlled the procedures by which the letter had been sent. Thus, Judge Kocoras reasoned, an attorney must have direct and personal involvement in the mailing of the letter—e.g., by reviewing the file to determine whether the letter should be sent, or by approving the mailing based on recommendations of others—in order for it not to mislead the recipient as to the nature of his involvement with the debt. 1999 WL 754566, at *3, citing *Avila*, 84 F.3d at 228. Dickerson contended that he was so involved: his firm engaged in a three-level review of the information supplied by Household before each letter was sent; and, by his own account, Dickerson himself worked two to three hours each day reviewing the 2,000 accounts that Household referred to him every month. Judge Kocoras viewed the firm's "review" as no more than a deceptive "veneer of compliance" with FDCPA, however. 1999 WL 754566, at *4.

A letter like Dickerson's suggests that the attorney writing the letter is familiar with the facts of the case and is prepared to pursue the case himself, the judge pointed out. *Id.* In fact, Dickerson lacked this level of involvement with the debt: Household did not forward debtor files to Dickerson, but only so much information as Dickerson needed to complete his form letter to each debtor; that letter directed the debtor to contact Household, not Dickerson; and Dickerson had not even created the letter specifically for Household, but simply had employed a customizable form created before Household became his client. *Id.* Moreover, Dickerson's "review" of the information supplied by Household was superficial: Dickerson and his staff merely proofread the data for incorrect amounts and typographical errors; they did not independently analyze contracts or any other information regarding the debtor. *Id.* In other words, none of the information that Dickerson reviewed enlightened him as to the particular circum-

stances of a debtor and his account before he sent a delinquency letter to that debtor. *Id.* In short, Dickerson was not exercising "independent, trained legal judgment on the validity of a claim." *Id.*

What happened *after* Dickerson's letter was sent likewise indicated to the judge that Dickerson was not meaningfully involved in the effort to collect Household's debts. Household did not inform Dickerson whether it received a response to his letter. *Id.* n.1. As for the responses that Dickerson himself received, the judge found that his handling of those responses was insufficient to suggest anything more than "a surface veneer of compliance with the FDCPA . . . ." *Id.* at *5. Moreover, Dickerson had never pursued a judgment on Household's behalf, nor had Household ever asked him to do so. *Id.* at *4. "We find this lack of litigation activity contradicts the impression given to an unsophisticated consumer; namely, that if she does not pay, the attorney sending her the collection letter will pursue a collection suit against her." *Id.*

"The key factor, however, is that the letters themselves are objectionable." *Id.* at *5. Dickerson merely sent each debtor a form letter "modified to reflect the meager information provided to [him] by Household Credit." *Id.* Furthermore, Dickerson did not sign the letters before they were issued; instead, Contract U.S.A. printed the letters, affixed a facsimile of Dickerson's signature to them, and mailed them. In *Clomon v. Jackson*, 988 F.2d 1314, 1321 (2nd Cir. 1993), the Second Circuit suggested that mass mailings prepared in this manner will frequently be false to the extent that they suggest that an attorney was directly involved in the process by which the letter was prepared and sent and that she had formed a professional opinion as to how the individual debtor's case should be handled. "For this reason, there will be few, if any cases in which a mass-produced collection letter bearing the facsimile of an attorney's signature will comply with the

restrictions imposed by § 1692e." *Id.* This court's opinion in *Avila* cited this passage from *Clomon* approvingly, Judge Kocoras noted. 1999 WL 754566, at *5; *see Avila*, 84 F.3d at 228, quoting *Clomon*, 988 F.2d at 1321. In conjunction with the "reams" of other evidence of noncompliance with the FDCPA, "[Dickerson's] letter clearly demonstrates a lack of involvement and an extraordinary abdication of legal duties by the Dickerson defendants in a large-scale, bulk operation." 1999 WL 754566, at *5.

Judge Kocoras therefore concluded as a matter of law that Dickerson's minimal involvement in the process by which the letter was sent to class members rendered the letter misleading in violation of section 1692e(3). Although the letter was prepared on his letterhead and included a facsimile of his signature, "the letters were not from him in any meaningful sense of the word." 1999 WL 754566, at *5.

Because the letter, in Judge Kocoras' view, falsely implied to the debtor that an attorney had become professionally involved in the collection of his or her debt, he believed that it also violated section 1692e(10)'s proscription of the use of any false representation or deceptive means to collect, or attempt to collect, a debt. 1999 WL 754566, at *6.

Finally, Judge Kocoras determined that Dickerson was additionally liable under the "flat-rating" provision of the FDCPA, section 1692j, which renders it unlawful to design, compile, and furnish any form knowing it would be used to create a false belief in the debtor that someone other than the creditor is participating in an effort to collect his debt, when in fact such person is not participating. The classic "flat-rater" effectively sells his letterhead to the creditor, often in exchange for a per-letter fee, so that the creditor can prepare its own delinquency letters on that letterhead. *See White v. Goodman*, 200 F.3d 1016, 1018 (7th

Cir. 2000). Use of a third party's letterhead gives the delinquency letters added intimidation value, as it suggests that a collection agency or some other party is now on the debtor's back. *See id.* Here, of course, Dickerson did not literally hand over his letterhead to Household. Yet, as Judge Kocoras had already determined with respect to section 1692e(3) and (10), Dickerson's letter to Nielsen and the other class members was not genuinely from him in the professional sense. This was sufficient, in the judge's view, to render Dickerson additionally liable under section 1692j. 1999 WL 754566, at *6. Judge Kocoras rejected the view of some courts that a defendant can either be a debt collector for purposes of liability under section 1692e or a flat-rater for purposes of section 1692j, but not both. He reasoned that liability under section 1692j attached when the defendant wrote or otherwise originated the form letter, knowing that it would be used to deceive consumers into believing that a third party had joined forces with the creditor to collect the delinquent debt. *Id.* "It is undisputed that the Dickerson defendants are responsible for creating the misleading and improper dunning letters at issue, and thus they are also liable under § 1692j." *Id.*

In the wake of the summary judgment ruling on liability, the parties reached a settlement as to damages, pursuant to which the defendants reserved the right to appeal the liability ruling. The defendants agreed to pay a total of $250,000, of which $1,500 was paid to Nielsen as the named plaintiff, $85,000 was paid to class counsel, and the remainder was divided pro rata among the other members of the class. The district court approved the settlement in an order issued on June 8, 2000. R. 79.

## II.

The appellants contend that the district court's summary judgment ruling was erroneous in four respects. *First*, they dispute Household's status as a "debt collector." Contrary

to the district judge's finding, they assert that Dickerson in fact did participate meaningfully in the collection of Household's debts. Consequently, they argue, Household did not falsely employ Dickerson's name in the effort to collect its own debts and cannot be treated as a "debt collector" for purposes of liability under section 1692e(3) and (10). *Second*, in the appellants' view, the facts did not permit the district court to conclude, as a matter of law, that Dickerson had no meaningful involvement in the process by which the delinquency letters were sent to class members. To the contrary, they see the record as being "replete" with evidence of Dickerson's involvement, so much so that the district court should have granted summary judgment in *their* favor on this point. *Third*, appellants contend that Dickerson cannot be held liable as a "flat-rater" under section 1692j. The same party cannot be both a debt collector and a flat-rater, they reason. That point aside, they emphasize that Dickerson did more than print the delinquency letters in exchange for a flat fee. For that reason, they believe that the court erred in holding Dickerson liable under this provision as a matter of law. *Fourth*, the appellants point out that the district court failed to consider whether Household should escape liability under the bona fide error defense recognized in the statute. *See* 15 U.S.C. § 1692k(c). Household asserts that it hired a reputable, independent law firm that in turn represented and agreed in writing that its procedures would comply with the FDCPA (and those procedures were not obviously deficient, in Household's view). Consequently, Household argues, any error that it made in securing Dickerson's involvement in its debt collections efforts should be excused as a bona fide error.

## A.  Household's liability as a "debt collector"

Because the FDCPA defines a "debt collector" as a person who endeavors to collect the debts owed to "another," 15 U.S.C. § 1692a(6), creditors who are attempting to col-

lect their own debts generally are not considered debt collectors under the statute. *Aubert*, 137 F.2d at 978. However, pursuant to the "false name" exception to this exclusion, a creditor will be deemed a debt collector if "in the process of collecting his own debts, [the creditor] uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." § 1692a(6). The district court concluded that Household had "used Dickerson's name and letterhead" to give Household's debtors the false impression that someone other than Household—more particularly, an attorney—had become involved in the effort to collect the amounts that these debtors owed to Household. 1999 WL 754566, at *3. That determination, of course, rests on the court's threshold finding that Dickerson was not meaningfully involved in the collection of Household's debts. *See id.* Because we agree, for the reasons we note below, that Dickerson was not genuinely involved in the effort to collect Household's debts and that the letter he sent to Household's debtors was not truly "from" Dickerson, we also agree that Household should be treated as a "debt collector" for purposes of liability under section 1692e(3) and (10).

B.   Violations of section 1692(e)(3) and (10)

The FDCPA broadly prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The statute proceeds to identify sixteen, non-exclusive instances of conduct that would constitute a violation of this prohibition. Two of these are relevant here:

* * *

(3) The false representation or implication that any individual is an attorney or that any communication is from an attorney.

* * *

(10)    The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

\* \* \*

15 U.S.C. § 1692e. There is no dispute that Dickerson is an attorney; the question instead is whether his letter to Households debtors was genuinely "from" Dickerson. The district court concluded that it was not, reasoning that Dickerson, as a legal professional, was not involved in Household's debt collection process in any meaningful sense. 1999 WL 754566, at \*5. Based on the undisputed facts, we agree.

As we recognized in *Avila*, a debt collection letter that is issued on an attorney's letterhead and over his signature conveys the notion that the attorney has "directly controlled or supervised the process through which the letter was sent"—i.e., that he has assessed the validity of the debt, is prepared to take legal action to collect on that debt, and has, accordingly, decided that a letter should be sent to the debtor conveying that message. 84 F.3d at 229. "The attorney letter implies that the attorney has reached a considered, professional judgment that the debtor is delinquent and is a candidate for legal action." *Id.* It is this implicit message that "get[s] the debtor's knees knocking" and makes the attorney letter a particularly effective method of debt collection. *Id.* If, however, the letter to the debtor is not the product of the attorney's professional judgment—if he has not independently determined that the debt is ripe for legal action by reviewing the debtor's file, for example; if he has not exercised discretion in deciding whether and when the letter should be sent to a given debtor; if he does not see the individual letter before it is sent—then the letter is misleading. *Id.* at 228-29. Attorney letters prepared en masse are frequently false for want of such judgment. *Id.* at 229. In order

to avoid that falsehood, the attorney must have genuine involvement in the process through which the letter was sent to the debtor. *Id.*

> [I]f a debt collector (attorney or otherwise) wants to take advantage of the special connotation of the word "attorney" in the minds of delinquent consumer debtors to better effect collection of the debt, the debt collector should at the least ensure that an attorney has become professionally involved in the debtor's file. Any other result would sanction the wholesale licensing of an attorney's name for commercial purposes, in derogation of professional standards . . . .

*Id.*

The undisputed facts make clear that Dickerson neither made a "considered, professional judgment" that Nielsen or any other class member was delinquent on her debt and a candidate for legal action nor meaningfully involved himself in the decision to send the dunning letter to any individual debtor. Consequently, the letters he sent to class members were not truly "from" him. Dickerson is therefore liable under 1692e(3) and (10) for the misleading nature of the letters.

First, Dickerson did not make the decision to send a letter to a debtor; Household did. Household regularly forwarded lists of delinquent debtors to Dickerson so that he might issue delinquency letters to these debtors. As Judge Kocoras observed, Household provided Dickerson only so much information about a debtor as Dickerson required in order to complete the letter. 1999 WL 754566, at *4, *5. To the extent that Dickerson eliminated some names from the list of delinquent debtors that Household provided (based on anything more than obvious gaps or errors in Household's information), the record suggests that he did so based solely on the discovery that the debtor had declared bankruptcy, had already been sent a letter,

or lived in one of three states which would not permit a letter of the kind that Dickerson had prepared. As we note below, this was purely a categorical assessment rather than one calling for an individualized, discretionary assessment by Dickerson. Finally, Household reserved the right to sign off on the issuance of Dickerson's letters. After Dickerson had finalized the list of debtors to whom letters were to be sent, that list was forwarded to Household. Dickerson then took no further action for a period of twenty-four hours, giving Household the chance to make any changes that it wished. Only then did Dickerson transmit the list to Contact U.S.A. for printing and mailing.

Second, in no sense did Dickerson "become professionally involved in the debtor's file." *Avila*, 84 F.3d at 229. Household did not provide Dickerson with debtor files, nor did it grant Dickerson access to its account system. The only information that Household provided to Dickerson was the debtor's account number, name, address, account balance, and amount past due. Dickerson had familiarized himself with the GM Cardmember and Disclosure Agreement, had a general understanding of the internal procedures that Household followed in administering the GM Card portfolio, and knew what steps Household had taken to collect on overdue accounts and how long those accounts had been delinquent before they were referred to him for collection. But Dickerson did not undertake to make a professional judgment as to the delinquency and validity of any individual cardholder's debt before he issued a letter to that debtor, nor could he have rendered such a judgment based on the limited information with which Household provided him. As Dickerson himself stated:

> . . . David D. Dickerson and Associates . . . *assume* that many demands for payment have been made on the debtor and that legal action is contemplated if it

appears that these debtors will not pay amicably and have the means to satisfy a judgment.

It is *understood* that these are accurate and valid claims for the amounts stated and that any information indicating that the debtors dispute any part(s) of the debt have been furnished to this office. . . .

R. 30 Ex. D (emphasis added).

Third, Dickerson's tripartite "review" of the debtor information supplied by Household, even to the extent that it was performed by an attorney at one or more levels, did not call for the exercise of professional judgment. The most substantive aspect of this review involved checking an internal database to determine whether a debtor had declared bankruptcy and running a computer check (supplemented by eyeball review) to screen out debtors who lived in certain pre-determined, prohibited states. These were purely "yes/no" assessments that involved no exercise of discretion; indeed, Household itself verified that a debtor had not died or declared bankruptcy and did not live in a prohibited state before it forwarded the debtor's name to Dickerson for issuance of a dunning letter. Aside from this, Dickerson's review was aimed at identifying missing data, typographical errors, and debtors whom he had already sent letters. The ministerial nature of Dickerson's review is confirmed by his own deposition testimony. Dickerson testified that in the course of reviewing a list of 148 delinquent accounts, he spent approximately two minutes per page of forty accounts—approximately three seconds per account, in other words. R. 46 Ex. A at 161-62. The brevity of that review lays bare its cursory nature. *See Boyd v. Wexler*, 275 F.3d 642 (7th Cir. 2001), *cert. denied*, 71 U.S.L.W. 3116 (U.S. Oct. 7, 2002) (No. 02-98).

Fourth, although Dickerson composed the dunning letter, it was a form letter that his firm, with the assistance of Contact U.S.A., prepared and issued en masse. The letter

was personalized only to the extent that it contained each debtor's account number, name, address, account balance, and the amount of the overdue debt—all information supplied by Household. The letter reflects no individualized assessment of the individual debtor's circumstances or her liability. For that matter, the form itself was not even one that Dickerson had written for Household; he had composed the letter before he took on Household as a client. Our point is not that a form letter rules out the possibility of an attorney's genuine, professional involvement in the collection of a debt. But along with the other evidence we highlight, the numbers (recall that Household referred Dickerson an average of some 2,000 accounts per month) and assembly-line fashion in which Dickerson's letter was issued betray the purely nominal nature of his participation in the collection process. The fact that he wrote the form does nothing to prove his professional involvement in the debtor's file. We also note that Household approved the form and reserved the right to approve any modifications to that form.

Fifth, Dickerson played barely more than a ministerial role in handling the responses to his letter. The letter instructed the debtor to make payment to GM Card (and included a payment coupon for that purpose) or to contact GM Card (via a toll-free number that connected the caller to Household personnel) in order to discuss payment arrangements. Dickerson's letterhead did include his firm's telephone number and address; the text of the letter also indicated that the debtor should contact "us" (presumably Dickerson) if the debtor disputed the validity of the debt or wished to be provided with the name and address of the original creditor (if different from GM Card). Consequently, a certain number of debtors did contact Dickerson rather than Household. When the debtor replied by letter, Dickerson and his staff categorized the communication and forwarded it to Household for handling with an appro-

priate cover letter alerting Household to the type of re-
sponse the firm had received from the debtor; a copy of
the cover letter was sent to the debtor so as to alert the
debtor that Household would be handling the matter. Phone
calls were handled in essentially the same manner, al-
though according to Dickerson, he attempted to answer
questions and be of help to the extent that he could. But
Dickerson typically could not provide the debtors with any
information about his or her individual account beyond
that included in Dickerson's letter; nor was the firm au-
thorized to negotiate a payment plan, settle, or otherwise
dispose of the debt. Household itself ultimately handled
all debtor responses to Dickerson's letter, including those
forwarded to it by way of Dickerson. There is no evidence
that Dickerson ever substantively handled the responses
himself.

Sixth, Household paid Dickerson a flat fee of $2.45 per
letter regardless of the result (if any) that the letter
produced. The fixed and quite modest nature of Dicker-
son's remuneration strongly suggests that Household
was paying for the marquee value of Dickerson's name
rather than his professional assistance in the collection of
its debts.

Seventh, Dickerson never took legal action in pursuit of
Household's debts. By the terms of the agreement be-
tween them, the firm was not authorized to take such
action except upon Household's direction. Although the
firm took regularly filed suits on behalf of other clients,
Household never asked Dickerson to do so on its behalf.

In sum, although an unsophisticated consumer would
have construed Dickerson's letter to reflect an attorney's
professional judgment that her debt was delinquent and
ripe for legal action, *see Avila*, 84 F.3d at 229, in fact
Dickerson had made no such assessment. Dickerson knew
nothing about the debtor and her potential liability beyond

what Household had conveyed to him; and Household provided Dickerson only the bare information that Dickerson required in order to complete the blanks in his form letter. Here, as in *Avila*, Dickerson, in his capacity as an attorney, was not the true source of the letter. 84 F.3d at 230. The letter thus ran afoul of 1692e(3) and (10).

We acknowledge that Dickerson took some steps that distinguish his involvement in the process by which letters were sent to debtors from the level of attorney involvement in *Avila* and similar cases. Dickerson reviewed the master contract governing GM Card accounts (*compare Sonmore v. CheckRite Recovery Servs., Inc.*, 187 F. Supp. 2d 1128, 1135 (D. Minn. 2001), where the attorney did not review "a single file or document relating to the debt"); he looked at the minimal information that Household provided regarding each overdue account, and therefore knew the identities of debtors who were to receive the letters (*compare Avila*, 84 F.3d at 229, *Clomon*, 988 F.2d at 1320, and *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1235 (5th Cir. 1997), where the attorneys did not even know to whom their letters were being sent); he checked the debtor information for typographical errors and to weed out debtors who had already received a letter from him, had declared bankruptcy, or lived in a prohibited state (*compare Clomon*, 988 F.2d at 1320, where the attorney "played virtually no day-to-day role in the debt collection process"); and he handled letters and phone calls received by his firm to the extent of categorizing them and forwarding them to Household (*contrast Laubauch v. Arrow Serv. Bureau, Inc.*, 987 F. Supp. 625, 631 (N.D. Ill. 1997), finding that company did not qualify as a "debt collector" where, inter alia, it was not involved with follow-up to delinquency letter). In these minor respects, Dickerson may have been "more" involved in the process by which letters were sent to the debtors than his counterparts in such cases as *Avila* and *Clomon*, but his

involvement still fell markedly short of what those cases require. His efforts, as Judge Kocoras aptly remarked, amounted to no more than a "veneer" of compliance with the FDCPA. *Avila*'s central requirement is crystal clear: an attorney must have some professional involvement with the debtor's file if a delinquency letter sent under his name is not to be considered false or misleading in violation of section 1692e(3) and (10). 84 F.3d at 229; *see also Boyd*, 275 F.3d at 646. Whatever Dickerson may have done, he had no such involvement with the file of any debtor slated to receive his form letter and played no meaningful role in the decision to send a debtor such a letter. Dickerson made no independent, professional assessment of the delinquency and validity of any debt, he did not select the debtors to whom a letter would be sent, and he did not make any assessment as to whether a debt was a candidate for legal action. He "reviewed" printouts of the debtor information supplied by Household, but only in the sense of literally looking at the data and checking for errors. He removed certain debtors from the recipient list, but not based on any individualized assessment of a debtor's delinquency or other pertinent circumstances; he and his firm simply identified debtors who had declared bankruptcy, had already received a letter from him, or who lived in "prohibited" states—a screening process little different from the checks that Household and Contact U.S.A. themselves performed. Moreover, contrary to the impression his letter would have given the unsophisticated debtor, Dickerson had not been engaged and was not prepared to take legal action in pursuit of the debt: he had no authority to negotiate a payment plan, settle, or otherwise dispose of any debt; he did not handle debtor responses to his letter beyond categorizing and forwarding them to Household; and he was never asked to and did not take legal action to collect on any debt. The details of this case may differ in minor respects, but in all material respects this case is on all fours with *Avila*. Just as

in *Avila*, the form letter issued on an attorney's letter-head and in his name was not "from" the attorney, *qua* attorney, in any meaningful sense. The violation of section 1692e(3) and (10) is inescapable.

Having reached that conclusion, the actual source of the letter is obvious. It was Household that selected the debtors to whom Dickerson's letter was to be sent. It was Household that provided the information that Dickerson needed regarding the identity of the debtor and the amount of his or her delinquency in order complete the letter. It was Household on which Dickerson relied for the determination that the debtor was indeed delinquent and therefore an appropriate recipient of the letter. It was Household that reserved the right to approve issuance of the letters. It was ultimately Household that handled all responses to Dickerson's letter. And it was Household that decided what further action (including legal action) would be taken in the wake of Dickerson's letter. For these and the other reasons we have discussed, Household was the true source of Dickerson's letter. Because it issued that letter under Dickerson's name, giving debtors the false impression that a third party (Dickerson) was involved in collecting the debt, Household is a debt collector pursuant to section 1692a(6), and therefore shares Dickerson's liability for the violations of section 1692e(3) and (10).

C.   Flat-Rating liability under section 1692j

Section 1692j(a) of the FDCPA makes it illegal for a person to "to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating." 15 U.S.C. § 1692j(a). This provision bars the

practice commonly known as "flat-rating," in which an individual sends a delinquency letter to the debtor portraying himself as a debt collector, when in fact he has no real involvement in the debt collection effort; in effect, the individual is lending his name to the creditor for its intimidation value, often in exchange for a "flat" rate per letter. *See White v. Goodman*, *supra*, 200 F.3d at 1017.

We have already concluded that Dickerson did not meaningfully participate in Household's debt collection efforts; he may therefore seem to be a natural candidate for flat-rating liability pursuant to section 1692j, particularly given the manner in which Household compensated his firm. There is some question, however, whether the same party may be held liable both as a "debt collector" and a "flat-rater". In order to qualify as a debt collector, an individual must have some involvement in the effort to collect another's debts. *See* 15 U.S.C. § 1692a(6). The premise of liability under section 1692j, however, is that the "flat-rater" is *not* involved in debt collection. Thus, some courts have concluded that liability as a debt collector forecloses liability as a flat-rater. *E.g.*, *Randle v. GC Servs. L.P.*, 48 F. Supp. 2d 835, 841 (N.D. Ill. 1999); *Anthes v. Transworld Sys., Inc.*, 765 F. Supp. 162, 168 (D. Del. 1991).

It is unnecessary for us to resolve this question. 1692j(b) provides that a flat-rater "shall be liable to the same extent and in the same manner as a debt collector . . . ." We have already sustained Judge Kocoras' determination that Dickerson is liable as a debt collector for violations of section 1692e(3) and (10). An additional finding that Dickerson is also liable pursuant to 1692j would have no impact on the judgment against him. *See Clomon*, 988 F.2d at 1318 ("[a] single violation of § 1692e is sufficient to establish civil liability under the FDCPA"). Accordingly, we do not resolve this question.

D.  Household's Bona Fide Error Defense

Section 1692k(c) provides:

> A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

Household contends that its own violation of the FDCPA, if any, was unintentional and resulted from a bona fide error in its efforts to comply with the statute and the cases interpreting it. Further,

> Household hired an independent and reputable attorney, knowing that he attended seminars on the FDCPA, subscribed to and read materials to keep abreast of FDCPA developments, and trained his employees with internal compliance manuals. Dickerson represented that the system he put in place was in full compliance with the FDCPA, and the detailed procedures he used—including a three-part review process, checks against databases, additional verification, and follow-up debtor communications—gave every appearance of being . . . in compliance.

Appellants' Opening Br. at 35-36. In granting summary judgment in favor of the plaintiff class, the district court did not address Household's invocation of section 1692k(c). Nielsen contends that Household is foreclosed from asserting a bona fide error defense because the mistake that Household and Dickerson made was one of legal interpretation; in Nielsen's view, the statute does not immunize defendants for mistakes of law.

There is a split of authority among the circuits as to whether the bona fide error defense applies to mistakes of law. The majority view is that the defense is only avail-

able for clerical and factual errors. *See, e.g.*, *Picht v. Jon R. Hawks, Ltd.*, 236 F.3d 446, 451-52 (8th Cir. 2001); *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 27 (2nd Cir. 1989); *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 779 (9th Cir. 1982); *see also Johnson v. Riddle*, ___ F.3d ___, 2002 WL 2029304, at *10 n.14 (10th Cir. Sept. 5, 2002) (collecting cases). The Ninth Circuit's opinion in *Baker*, the first appellate precedent on this point, looked principally to the cases that had uniformly construed the Truth-in-Lending Act's ("TILA") bona fide error provision, 15 U.S.C. § 1640(c), not to immunize legal errors. 677 F.2d at 779. The TILA provision, however, expressly states that "an error of legal judgment with respect to a person's obligations under this subchapter is *not* a bona fide error." § 1640(c) (emphasis supplied). It also includes an illustrative list of errors that would constitute bona fide errors, including "clerical, calculation, computer malfunction and programming, and printing errors." *Id.* By contrast, the FDCPA's provision does not expressly remove legal mistakes from the realm of errors that can be considered bona fide, nor does it in any other way illustrate what types of mistakes can or cannot be deemed bona fide. Noting the distinction between the two statutory provisions, "a growing minority" of courts, *Johnson*, 2002 WL 2029304, at *10, including the Tenth Circuit, have concluded that mistakes of law can be considered bona fide errors under section 1692k(c). *id*, at *10-*11 & n.14 (so holding and collecting cases). Our own opinion in *Jenkins v. Heintz*, 124 F.3d 824, 832 n.7 (7th Cir. 1997), *cert. denied*, 523 U.S. 1022, 118 S. Ct. 1304 (1998), likewise notes that nothing in the language of the FDCPA bona fide error provision limits the reach of the defense to clerical errors and other mistakes not involving the exercise of legal judgment. Yet, as *Jenkins* itself pointed out, there was no evidence that the mistake at issue in that case actually had involved the exercise of any legal judgment. *Id.* at 832. Consequently, we did not have occasion to further illuminate whether and when

legal errors constitute bona fide errors under section 1692k(c).

Assuming, consistent with our observations in *Jenkins*, that a legal mistake can qualify as a bona fide error under the FDCPA, a second question presents itself. Section 1692k(c) requires the debt collector to prove, inter alia, that its violation of the FDCPA "was not intentional." In this respect, the bona fide error provisions of TILA and the FDCPA are virtually identical; TILA too requires proof that "the violation was not intentional." 15 U.S.C. § 1640(c). In *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1166-67 (7th Cir. 1974), we held that the relevant intent was the defendant's intent to commit the act determined to be a violation of TILA, not an intent to commit a violation of the statute. Thus, so long as the act found to be a violation of TILA is deliberate, the bona fide error defense is unavailable. *Id.* If the same holds true for the FDCPA, the bona fide error defense would likewise be unavailable to Household: Household's actions were not inadvertent; rather, it *intended* to use Dickerson in the very manner that we have found to violate the FDCPA. *See id.* Whether or not the FDCPA's bona fide error provision should be interpreted in this manner is open to debate, however. The Sixth Circuit has concluded that a debt collector may avoid liability via the bona fide error defense by showing that it did not intend to violate the statute: "The debt collector must only show that the violation was unintentional, not that the communication itself was unintentional." *Lewis v. ACB Bus. Servs. Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). And, as Judge Tinder has pointed out, although the pertinent language of the two statutes is the same, there are other differences between them that may support differing constructions. *See Frye v. Bowman, Heintz, Boscia & Vician, P.C.*, 193 F. Supp. 2d 1070, 1087-88 (S.D. Ind. 2002). This question, which the parties have not addressed, is not one that

we need decide here. We shall again assume that House-
hold may avail itself of the bona fide error defense be-
cause it had no intent to violate the FDCPA, although its
actions were deliberate.

What dooms Household's bona fide error defense is that
its actions, along with Dickerson's, were in plain contraven-
tion of our opinion in *Avila. See*, *e.g.*, *Hulshizer v. Global
Credit Servs., Inc.*, 728 F.2d 1037, 1038 (8th Cir. 1984) (per
curiam) (finding no basis to invoke the bona fide error
defense where "[t]he language of the statute [was] unambig-
uous and [the creditor's] disregard of that language [was]
undisputed"); *see also* Janet Flaccus, *Fair Debt Collection
Practices Act: Lawyers and the Bona Fide Error Defense*,
2001 ARK. L. NOTES 95 (2001) (arguing that the bona fide
error defense should be available when the law is unset-
tled, but not when it is reasonably clear). *Avila*, which was
decided nearly a year before Household retained Dicker-
son, made clear that an attorney must have some profes-
sional involvement with the debtor's file in order for the
presence of his name on a delinquency not to be mislead-
ing. 84 F.3d at 229. Many of the very omissions that we
highlighted in *Avila* were present here: Neither Dickerson
nor any member of his staff reviewed the debtor's file, *see
id.* at 228; Dickerson did not make the decision whether
to send any particular debtor a delinquency letter, *id.* at
228-29; Dickerson's letters were mass produced and me-
chanically signed, *id.* at 228, 229; and Household never
engaged Dickerson to file suit or take other legal action
in pursuit of a debt, *id.* at 230. Here, as in *Avila*, Dicker-
son made no independent, professional assessment that
the debt was delinquent, that the debt was a candidate
for legal action, and that the debtor should be sent a
delinquency letter. *See id.* at 228-29. Here, as in *Avila*,
Dickerson, acting *as* an attorney, was not the true source
of the letter. *Id.* at 230. It was Household that selected
debtors for receipt of Dickerson's letter; it was Household

that supplied the information Dickerson required (and only such information as he required) to complete the letter; it was Household that had final say over the recipient list; it was Household that handled the responses to Dickerson's letter; and it was Household (presumably with legal assistance that it obtained from a firm other than Dickerson's) that took legal action as necessary to enforce the debt. As we discussed earlier, the minor additional steps that Dickerson took to involve himself in the process of preparing and sending the letters were, in Judge Kocoras' words, a mere "veneer" of compliance with the FDCPA. Dickerson's actions complied neither with the spirit nor the letter of *Avila*; no reasonable attorney, and for that matter, no reasonable creditor or debt collector, having read our opinion, could have failed to appreciate this. Whatever steps Dickerson took to familiarize himself with the law, including precedents like *Avila*, obviously were inadequate. Having hired Dickerson, and having itself participated in a process by which delinquency letters were sent to debtors on Dickerson's letterhead without his meaningful involvement in the process—indeed, having signed a contract with Dickerson which spelled out that very process (*see* R. 53, Exhibits in Support of Household's Motion for Summary Judgment, Ex. 4 ¶ 1)—Household cannot avail itself of the bona fide error defense.

### III.

For the reasons we have discussed, we AFFIRM the district court's decision to grant summary judgment in favor of the plaintiff class.

A true Copy:

      Teste:

                   _____

                   *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*