**CORNWALL et al., Appellees,**

**v.**

**NORTHERN OHIO SURGICAL CENTER, Ltd., et al., Appellants.**

[Cite as *Cornwall v. N. Ohio Surgical Ctr.,* 185 Ohio App.3d 337, 2009-Ohio-6975.]

Court of Appeals of Ohio,
Sixth District, Erie County.

No. E–09–001.

Decided Dec. 31, 2009.

Todd E. Gurney, Brian N. Eisen, William M. Greene, and Romney Cullers, for appellees.

William D. Bonezzi and Donald J. Richardson, for appellants.

HANDWORK, Presiding Judge.

{¶ 1} Appellants, Gary D. Kresge, D.O., and his medical group, Northern Ohio Medical Specialists, L.L.C. ("NOMS"), appeal a judgment of the Erie County Court of Common Pleas. The following facts are relevant to our disposition of this cause.

{¶ 2} Mary Cornwall, a 55–year–old woman with a history of pulmonary hypertension, was referred to Dr. Kresge for an arthroscopic operation on her left knee. During the surgery performed on September 5, 2006, Mary developed tachycardia (an overly fast heartbeat). She was treated with Esmolol, which appeared to abate the problem. Twenty minutes later, however, Mary developed tachycardia, as well as pulmonary hypertension, which led to a full cardiac arrest. Cardiac resuscitation was successfully performed, but Mary never regained consciousness. She was transported to Firelands Hospital where she died six days later.

{¶ 3} On August 23, 2007, appellee, John Cornwall, Mary's husband, as next of kin and the administrator of her estate, filed the instant wrongful-death action against Dr. Kresge and NOMS. Other named defendants in the case include David R. Hall, CRNA, a certified nurse anesthetist, and Eastside Anesthesia Group, Inc. The parties to this cause then engaged in discovery.

{¶ 4} In his deposition, Dr. Kresge claimed that he had no knowledge of the fact that Mary had pulmonary hypertension until he arrived at Firelands Hospital. He asserted that if he had known of her condition, he would have conferred with Mary's primary-care physician, asked whether it was a problem, and, if so, what he needed to do to safely perform surgery on this particular patient. Despite this assertion, an office note written by a Dr. Avendano dated March 16, 2006, was found in the chart compiled for Mary by Dr. Kresge and his staff and specified that she had pulmonary hypertension.

{¶ 5} When appellee deposed Dr. Kresge's resident, Alireza Behboudi, he averred that on August 23, 2006, he performed an examination of Mary, took her medical history, and wrote down any of her physical conditions, as well as any medications that she was taking. Dr. Behboudi indicated that Mary told him that she had a "lung problem" and used "oxygen." After looking at his handwritten notes, he also stated that he had listed Revatio as one of her medications. According to Dr. Behboudi, he then dictated Mary's history and medications on a dictaphone for typing and for placement in her chart and in Dr. Kresge's office note. Nevertheless, it is undisputed that Dr. Kresge's office note neither contained any mention of the fact that the decedent had pulmonary hypertension nor specified that Mary took Revatio for this condition. A letter to Dr. Oberer, Mary's referring physician, did, however, contain the name of this drug.

{¶ 6} In her deposition testimony, Gloria Jean Gregory, a NOMS employee, stated that she transcribed Dr. Behboudi's dictation, saving it on Firelite, which she described as a "huge thumb drive" attached to her desktop computer. According to Gregory, she then typed a letter dictated by Dr. Behboudi discussing Mary's medical history. This letter was sent to Dr. Oberer. Subsequently, she used the information in the letter to create Dr. Kresge's office note. When asked why Revatio appeared in the letter but not in the office note, Gregory opined that when she "cut and pasted" from the letter, she might have unintentionally failed to cut and paste that medication. She also revealed that as of September 8, 2008, she was told not to use the computer upon which she transcribed Mary's medical history and medication in 2006, presumably because it was infected with a virus. Finally, Gregory denied that someone purposely changed the requested records and swore that the letter and the office note were last modified on the date each was created.

{¶ 7} Based upon the information gleaned from discovery, appellee filed an amended complaint in which he alleged a claim for spoliation of evidence and a claim for fraud against Dr. Kresge and NOMS. The claim for spoliation was premised on an allegation that Dr. Kresge's office note was intentionally altered to delete any mention of Revatio and that despite appellee's request, appellants permitted an information technologist access to the desktop computer upon which the office note was transcribed. According to appellee, that computer was thereafter "rendered nonfunctional." In alleging fraud, appellee maintained that appellants "[w]illfully altered, destroyed, and/or concealed evidence [on the Firelite and desktop computer hard drives] with the purpose of disrupting Plaintiff's case."

{¶ 8} On September 24, 2008, appellee filed his expedited motion for discovery, asking the court to allow his forensic computer expert to create a "mirror image" or "clone" of the hard drive or drives upon which the following documents were created: (1) Dr. Kresge's office note of August 23, 2006; (2) Dr. Kresge's office note of September 5, 2006; and (3) Dr. Kresge's August 23, 2006 letter to Dr. Oberer.

{¶ 9} Appellants opposed appellee's motion, arguing that their hard drives contained privileged health information of "hundreds other patients" dating back to 2006. They further maintained that appellee's proposed method for the search of the hard drive(s) was prohibited by the Health Insurance Portabilty and Accountability Act and R.C. 2317.02(B)(1). Appellee filed a reply memorandum.

{¶ 10} On November 7, 2008, the court below held a hearing on appellee's motion.

{¶ 11} On December 9, 2008, the common pleas court granted that motion. The court ordered appellants to allow appellee and his forensic expert to examine

both the Firelite and desk-computer hard drives upon which the three documents in question were created. As part of that examination, the court permitted appellee's expert to (1) "make bit-by-bit 'mirror images' of the Firelite drive and the hard drive of the desktop computer"; (2) mount the images on a computer, index the images and perform a search of the images "using standard forensic computer software" at either Dr. Kresge's office or another site mutually agreed upon, in writing, by the parties to this cause; (3) use a limited number of terms as determined by the trial judge that are related to Mary Cornwall and her condition in searching the data files and unallocated space of the designated computer and Firelite; (4) provide appellants with a computer disk containing the a list of the items that had the search terms in them, plus an initial report consisting of said list; and (5) search the event logs and registry files of the aforementioned computer equipment and deliver the list of results to defense counsel.

{¶ 12} The trial judge further directed defense counsel to review the initial report, event logs, and registry files in order to determine what on those lists defense counsel deemed privileged and to create a "privilege log" of the same. The judge then stated that if appellee wanted to challenge any of the items deemed privileged by appellants, they could challenge the assertion of privilege in court. Additionally, the court held that appellants could have their own expert present during the entire process and could, at their own expense, make their own "mirror images" of the pertinent drives. Once the entire process was complete, the parties were ordered to deliver the mirror images, under seal, to the trial court. Finally, the judge ordered counsel for appellants to draft a confidentiality agreement to be approved by appellee and signed by the expert retained by each of the parties.

{¶ 13} Appellants filed a timely appeal from this interlocutory order and assert the following assignment of error:

{¶ 14} "The trial court erred by ordering defendants to surrender two computer hard drives containing privileged patient health information of non-party patients to plaintiff to copy, examine and search.

{¶ 15} "A. R.C. 2317.02 prohibits the disclosure of privileged health information obtained through the physician-patient relationship.

{¶ 16} "B. The trial court abused its discretion when it ordered defendants to disclose privileged health information of non-party patients to plaintiffs to copy and inspect.

{¶ 17} "C. Civil Rule 34 does not authorize plaintiff intrusive access to defendants' computer hard drives to copy and inspect."

{¶ 18} In their first argument, appellants assert that the trial court abused its discretion in allowing appellee's expert, Gregory Kinsella, to engage in the "mirror imaging"[1] of the Firelite hard drive and the hard drive of the desk computer because it will reveal the privileged medical information pertaining to some of appellants' other patients, as well as of Mary, in violation of R.C. 2317.02. Ordinarily, we review a trial court's action regarding discovery issues for an abuse of discretion. *Tracy v. Merrell Dow Pharmaceuticals, Inc.* (1991), 58 Ohio St.3d 147, 151–152, 569 N.E.2d 875. Nevertheless, if the discovery issue is that of privilege, it is a question of law that must be reviewed de novo. *Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, 909 N.E.2d 1237, ¶ 13.

{¶ 19} Civ.R. 26 provides:

{¶ 20} " * * *

{¶ 21} "(B) Scope of discovery

{¶ 22} "Unless otherwise ordered by the court in accordance with these rules, the scope of discovery is as follows:

{¶ 23} "(1) In General. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, *electronically stored information*, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." (Emphasis added.)

{¶ 24} Thus, under Civ.R. 26, a party may discover any information stored on a computer hard drive that is relevant to an issue in a case unless it is privileged. However, R.C. 2317.02(B)(1) provides that absent enumerated exceptions (which are not applicable in the present case), a physician cannot testify concerning a

---

1. "Mirror imaging" is defined as the creation of " 'a forensic duplicate which replicates bit for bit, sector for sector, all allocated and unallocated space * * * on a computer hard drive.' " *Balboa Threadworks, Inc. v. Stucky* (Apr. 27, 2006), D.Kan. No. 05–1157–JTM, 2006 WL 1128689, quoting *Communications Ctr., Inc. v. Hewitt* (Apr. 5. 2005), E.D.Cal. No. Civ.S–03–1968 WBS KJ, 2005 WL 3277983. See also *Ferron v. Search Cactus, L.L.C.* (Apr. 28, 2008), S.D.Ohio No. 2:06–CV–327, 2008 WL 1902499. A number of courts have permitted mirror imaging to access information on computer hard drives. See, e.g., *Ferron; Antioch Co. v. Scrapbook Borders, Inc.* (D.Minn.2002), 210 F.R.D. 645; *Cenveo Corp. v. Slater* (Feb. 12, 2007), E.D.Pa. No. 06–CV–2632, 2007 WL 527720; *Balboa Threadworks; Ameriwood Industries, Inc. v. Liberman* (Dec. 27, 2006), E.D.Mo. No. 4:06CV524–DJS, 2006 WL 3825291, as amended by *Ameriwood Industries, Inc. v. Liberman* (July 3, 2007), No. 4:06CV524–DJS, 2007 WL 5110313; *In re Honza* (Tex.App.2008), 242 S.W.3d 578.

communication made by a patient in relation to the physician's advice to that patient. This testimonial privilege includes any communications involving "information * * * concerning facts, opinions, or statements necessary to enable a physician * * * to diagnose, treat, prescribe, or act for a patient" and encompasses communications in a medical record. See R.C. 2317.02(B)(5)(a). Thus, appellants are correct in asserting that appellee and/or his expert cannot view privileged communications of any of Dr. Kresge's patients and/or NOMS patients that are on the Firelite and computer hard drives.

{¶ 25} Appellants ignore the fact, however, that Kinsella, who specializes in computer forensics and electronic data discovery, testified that in the process of creating the mirror images of the hard drives, he will not be required to look at the contents of each of the separate files. Rather, after the mirror image is created, he will search only for the key words permitted by the trial judge in order to create an index of the specific files containing those terms. These would then be electrically transferred to a CD Rom and given to appellants so that they could create a privilege log consisting only of the index names.

{¶ 26} When asked whether he could inadvertertently see patients' medical information during the search for specific items on the Windows Event Log and Windows Registry, Kinsella replied that the event log simply contains activities, such as deleting a file, that occurred in the operating system and that there was no risk of viewing a patient's file. As to the Windows Registry, Kinsella explained that this program simply provides "information such as when the last time the computer was turned on, what kind of devices may have been plugged into the actual computer itself, [and] when those devices were plugged in." Based upon the foregoing review, we hold that R.C. 2317.02(B)(1) does not bar the mirror-imaging process in this case.

{¶ 27} Relying on *Biddle v. Warren Gen. Hosp.* (1999), 86 Ohio St.3d 395, 715 N.E.2d 518, appellants next argue that because the search terms used in this case are so broad, they will undoubtedly "pull up" privileged information, thereby subjecting Dr. Kresge and NOMS to tort liability for the nonconsensual disclosure of patient information. We acknowledge that in *Biddle*, the Supreme Court of Ohio held:

{¶ 28} "[A]n independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship." Id. at paragraph one of the syllabus.

{¶ 29} Nonetheless, Kinsella testified that while the search words would list any files/reports using those terms, he would not view the reports themselves. He would simply turn his initial report over to defense counsel for the develop-

ment of a privilege log pursuant to court order. Furthermore, it is obvious from the trial judge's order that appellee's trial counsel will not view the contents of the listed files—they are simply to create the privilege log using the list. Then, and only then, can appellants challenge *in court* any specific item on the log as being subject to privilege. Thereafter, the court, not appellants or appellee, will determine whether the contents of any particular item on the log is privileged. Accordingly, appellants' second argument is without merit.

■ {¶ 30} Finally, appellants assert that Civ.R. 34 does not authorize "unrestricted direct access to [their] computer database to copy and inspect." Civ.R. 34(A) reads:

{¶ 31} "Subject to the scope of discovery provisions of Civ.R. 26(B), any party may serve on any other party a request to produce and permit the party making the request, or someone acting on the requesting party's behalf: (1) to inspect and copy any designated documents or electronically stored information including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained that are in the possession, custody, or control of the party upon whom the request is served."

{¶ 32} Citing the notes to Fed.Civ.R.P. 34(b), appellants assert that it is only when data cannot be made usable by the responding party that the discovering party "may be required" to use his own devices to translate the requested data into usable form. Appellants, therefore, insist that they, not appellee, are the only parties who can supply appellee with the data from the Firelite and desktop computer.

{¶ 33} Appellants bolster this argument with the case of *In re Ford Motor Co.* (C.A.11, 2003), 345 F.3d 1315. In *Ford,* the plaintiff, Elizabeth Russell, was injured in a motor-vehicle accident while driving her Ford vehicle. Id. at 1316. She brought suit against Ford, alleging that her vehicle was defectively designed because her seatbelt "inertially unlatched" during the accident and caused her injury. Id. In a motion to compel, Russell sought direct access to two of Ford's databases in order to search for any other claims related to the "inertial unlatching of the RCF–67 seatbelt buckle." Id. The district court granted Russell's motion before the time for Ford to respond had lapsed. Id. · After the district court denied its motion for reconsideration, Ford filed a motion "for a writ of mandamus or prohibition" in the Eleventh Circuit Court of Appeals. Id.

{¶ 34} The circuit court determined that absent some condition such as improper conduct on the part of the responding party, Fed.Civ.R.P. 34(a) does not give the requesting party the right to conduct the actual search. Id. at 1317. In applying this holding to the case before it, the circuit court noted that the

district court failed to state any abuse of the discovery process by Ford, failed to set forth any protocols for Russell's search of Ford's databases, and did not even designate any restricting search terms. Id. While acknowledging that some type of direct access is permissible in certain circumstances, the circuit court did not find that those circumstances existed in *Ford.* Id. Therefore, the court granted the automobile manufacturer's petition for a writ of mandamus. Id. See also *Powers v. Cooley Law School* (Sept. 21, 2006), W.D.Mich. No. 5:05–CV–117, 2006 WL 2711512.

{¶ 35} For the following reasons, we find that the present case can be distinguished from *Ford.* Here, appellee learned of the discrepancies in the letter to Dr. Oberer and Dr. Kresge's office note during the discovery process itself. He was then told that the computer upon which that letter and note were created had a virus and/or was rendered inoperable. Thus, unlike the circumstance in *Ford,* it was impossible for appellants to produce those documents. Furthermore, the circumstances under which the letter and the office note disappeared and the computer virus/inoperability was allegedly discovered raises an inference of improper conduct. It was then, and only then, that appellee amended his complaint to add claims of spoliation and fraud.

{¶ 36} In addition, there is a direct relationship between appellee's claims of spoliation and fraud. See *In re Weekley Homes, L.P.* (2009), 295 S.W.3d 309, 319 (courts are more likely to allow direct access to a party's electronic storage device if there is a direct relationship between the device and the claims made in the case); Cf. *John B. v. Goetz* (C.A.6, 2008), 531 F.3d 448, 460 (courts are less likely to permit mirror imaging where "the connection between computers and the claims in a lawsuit are unduly vague or unsubstantiated in nature").

{¶ 37} Specifically, in order for appellee to recover on his claim for spoliation of evidence, he is required to prove all the following elements: (1) pending or probable litigation involving appellants; (2) knowledge on the part of appellants that litigation exists or is probable; (3) willful destruction of evidence by appellants designed to disrupt the appellee's case; (4) disruption of the appellee's case; and (5) damages proximately caused by the appellants' acts. *O'Brien v. Olmsted Falls,* 8th Dist. Nos. 89966 and 90336, 2008-Ohio-2658, 2008 WL 2252527, ¶ 17, citing *Smith v. Howard Johnson Co.* (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037.

{¶ 38} Further, in order to prevail on his claim of fraud, appellee must demonstrate, by a preponderance of the evidence, that (1) appellants represented that they had no knowledge of Mary's pulmonary hypertension; (2) this representation was made with the knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (3) it was made with the intent of misleading appellee into relying upon it; (4)

appellee justifiably relied upon this representation; and (5) the resulting injury, Mary's death, was proximately caused by the reliance. *Williams v. U.S. Bank Shaker Square*, 8th Dist. No. 89760, 2008-Ohio-1414, 2008 WL 802523, ¶ 14.

{¶ 39} Upon reviewing the elements of these two claims, it is clear that appellee can recover on either or both of them only if he is allowed to determine whether appellants' Firelite and hard drive on the desk computer were willfully altered (spoliation) and/or appellants falsely represented that they had no knowledge of Mary's pulmonary hypertension at the time of her arthroscopy (fraud). In other words, there is a direct relationship between the claims made and the Firelite and desktop-computer hard drives.

{¶ 40} Finally, unlike the unfettered access to the responding party's data in *Ford*, the trial court in the present case set forth a specific protocol and definite search terms and the means necessary to protect privileged information. Therefore, appellants' argument with regard to Civ.R. 34 is without merit, and their sole assignment of error is not well taken.

{¶ 41} The judgment of the Erie County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24(A).

Judgment affirmed.

PIETRYKOWSKI and ABOOD, JJ., concur.

CHARLES D. ABOOD, J., retired, sitting by assignment.