**Tracy PASSA, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**CITY OF COLUMBUS, et al., Defendants.**

**Case No. 2:03–CV–81.**

United States District Court, S.D. Ohio, Eastern Division.

Sept. 28, 2010.

Judith B. Goldstein, Kathaleen Beth Schulte, Equal Justice Foundation, Columbus, OH, Stephen Robert McCann, Graham & Graham LPA, Zanesville, OH, for Plaintiff.

Glenn Brooks Redick, City Attorney's Office, Joseph Miles Gibson, Gibson & Robbins–Penniman, Charles Halter Lease, Law Office of Charles H. Lease Inc., M. Brandon Teeples, Ricketts Co. LPA, Columbus, OH, Eric Jay Wittenberg, Eric J. Wittenberg Co., L.P.A., Richard Todd Ricketts, Ricketts Co., LPA, Pickerington, OH, for Defendants.

### OPINION AND ORDER

NORAH McCANN KING, United States Magistrate Judge.

Plaintiff Tracy Passa ("plaintiff"), acting on behalf of herself and classes of plaintiffs,[1] alleges that defendant City of Columbus ("City") violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Revised Code ("O.R.C.") § 1345.01 *et seq. Plaintiff's First Amended Complaint,* Doc. No. 33, ¶¶ 84–98. *Plaintiff's First Amended Complaint* also includes a claim under 42 U.S.C. § 1983 and claims of common law fraud and civil conspiracy under O.R.C. § 2923.34.[2] All claims arise out of the City's Check Resolution Program ("Program") and the participation in that Program by payday lenders.[3]

With the consent of the parties, 28 U.S.C. § 636(c), a trial to the Court on the issue of liability[4] was held on September 13, 2010. Pursuant to Fed.R.Civ.P. 52, the Court now makes the following findings of fact and conclusions of law.

## I. THE EVIDENCE

### A. The Program

For more than twenty years, the City has maintained the Program through its Alternative Dispute Resolution Unit of the City Attorney's Office. The City initially implemented the program at the suggestion or request of the Franklin County Municipal Court in order to reduce the number of criminal charges and merchant complaints. According to a brochure published by the City, *Plaintiff's Trial Exhibit 15,* "[t]he Check Resolution Program assists in the collection of money lost to merchants due to the passing of bad checks. Dishonored checks result in higher prices for consumers and a larger docket for the Franklin County Municiapl [sic] Court." Richard Pfeiffer, Jr., the Columbus City Attorney since 2003, testified that the primary purpose of the Program is to mediate disputes without formal action of any kind, whether civil or criminal.

Barbara Williams, the current Check Coordinator for the Program, has worked for the Program since 1994 and has been its coordinator since 2001. Ms. Williams described the usual procedures associated with the Program. First, an eligible merchant must complete a case submission form provided by the Office of the City Attorney. *Plaintiff's Trial Exhibit 11.* In that form, the merchant indicates, *inter*

---

1. The Court granted plaintiff' motion to certify a plaintiff class and subclass in connection with plaintiff's claims against the City. *Opinion and Order,* Doc. No. 190.

2. Plaintiff's counsel conceded at trial that the claim under 42 U.S.C. § 1983 is coextensive with the FDCPA claim. Accordingly, the Court will not separately consider a claim under Section 1983.

3. The payday lender defendants, however, have been dismissed. *See Motion for Voluntary Dismissal,* Doc. No. 193; Order, Doc. No. 194.

4. This Court bifurcated the issues of liability and remedy. *Order,* Doc. No. 197.

*alia,* the name and address of the issuer of the dishonored check, the check number, the original amount of the check and the amount allegedly outstanding. *Id.; Plaintiff's Trial Exhibit 10.* A $3.00 [5] administration fee for each submission must also be paid. *Plaintiff's Trial Exhibit 10.* According to Ms. Williams, there is no evaluation performed to determine whether the check was written within Franklin County or was improperly dishonored.

Upon receipt of the case submission form and payment of the administration fee, Ms. Williams schedules a mediation session involving a representative of the merchant and the alleged issuer of the dishonored check. A notice of mediation is mailed to the alleged issuer of the dishonored check, as identified in the case submission form, requesting that the customer appear for mediation at the Franklin County Municipal Court to resolve a complaint made against the customer:

> Please be advised that a complaint regarding a dishonored Check(s) has been made against you by the above referenced store/merchant concerning your Check No(s) listed below and the corresponding amounts. A Check Resolution Mediation has been scheduled in an attempt to resolve this issue.
>
> You are hereby requested to appear in person in Courtroom 4C, located on the fourth floor 375 S. High Street, on the date [mediation date specified by the City].
>
> The Check Resolution Mediation is an out-of-court meeting between you and the merchant to attempt to resolve this issue. **(There may be up to a one hour wait.)**
>
> **Do not bring any children to the mediation.**

> **DO NOT SEND PAYMENT IN ANY FORM TO THE CITY PROSECUTOR'S OFFICE!**
> A merchant representative will be present at the time of your Mediation who can accept your payment.
> ***If you have any questions, contact the merchant directly at the above phone number.***
> **YOU MUST BRING THIS NOTICE WITH YOU TO THE MEDIATION**

*Plaintiff's Trial Exhibit 5* (emphasis in original).

This notice, which features the seal of the Columbus City Attorney, also lists information regarding the particular disputed check, including the check number and the amount of the check. *Plaintiff's Trial Exhibit 5.* In addition, the letter would list the City's $3.00 administrative fee, and any returned check fee charged by the merchant, which would be added to the principal amount allegedly owed by the issuer of the dishonored check. *Id.*

In Ms. Williams's experience, this first notice ordinarily results in the payment of all amounts due without the need for actual mediation. *See, e.g., Plaintiff's Trial Exhibit 8.* If the matter proceeds, the mediation is held in a conference room located in the Franklin County Municipal Courthouse in Columbus, Ohio, although the parties are directed to report to a particular courtroom. Since 2000, the City has retained the services of experienced mediators who are trained in mediation techniques and who have no vested interest in the matter mediated. If the matter is not resolved at the first mediation, or if the alleged issuer of the check fails to appear at the mediation, a second mediation is scheduled. The City sends a second and final letter to the alleged issuer, confirming the date of the second mediation. *See, e.g., Plaintiff's Trial Exhibit 6.*

---

**5.** Sometime after the relevant time period, this fee was increased to $4.00.

This second notice contains substantially the same information as the first, with two exceptions: A new mediation date is offered and the following appears: *"SECOND AND FINAL NOTICE."* *Id.* According to Ms. Williams, this second notice is the last written communication between the Program and the alleged issuer of the dishonored check.

According to Ms. Williams, the process could end with a variety of outcomes, *e.g.,* payment in whole or in part, evidence of the issuer's bankruptcy, or evidence that the check has been made the basis of a police report.

### B. Payday Lenders

Payday lenders make "small, short-term, high-interest consumer loans in which the lender's collateral is a post-dated check...." *Final Pretrial Order,* Doc. No. 209, at 3. The post-dated check is issued at the time that the loan is made. If the loan, along with associated interest and fees, is not paid at the required time, it is understood that the post-dated check would be presented for payment. *See generally Plaintiff's First Amended Complaint.*

According to Ms. Williams, a former City Attorney permitted payday lenders to participate in the Program even though the Office of the City Attorney had determined that the dishonor of a post-dated check could not support a criminal charge. If a matter involving a payday lender was not resolved, the creditor was left to pursue its available remedies, which did not include a criminal prosecution by the City. Between 2001 and 2004, Ms. Williams' office regularly prepared reports that documented the experience of the Program as utilized by payday lenders. *Plaintiff's Trial Exhibit 14.* These reports include the substantial amounts paid to payday lenders who utilized the Program.[6]

### C. Plaintiff's Dispute with Check$mart

At all times relevant to this action, plaintiff has resided some distance from Franklin County. She is a high school graduate and attended college for two years. She has purchased and sold three homes. In 1994, plaintiff pled guilty to two counts of forgery in Belmont County. Plaintiff paid restitution in that case and was placed on probation. Plaintiff testified that this experience has caused her to fear the criminal justice system.

Plaintiff has obtained several consumer "payday" loans from BCCI Management Co. dba Check$mart ("Check$mart"), at its Zanesville, Ohio, facility. *Plaintiff's Trial Exhibit 19.* One such loan, for $400.00, was made on April 24, 2002, for which plaintiff agreed to pay to Check$mart $460.00[7] on May 8, 2002. *Id.* As collateral for this loan, plaintiff issued a check dated May 8, 2002, in the amount of $460.00. *Plaintiff's Trial Exhibit 21.* Plaintiff understood that she was required to pay the full amount due, *i.e.,* $460.00, on or before May 8, 2002.

Sometime prior to that date, plaintiff realized that she would be unable to repay the loan and, further, that her checking account had insufficient funds to cover her post-dated check. She telephoned the Check$mart office on May 8, 2002, advised

---

**6.** Beginning sometime after Richard Pfeiffer, Jr., assumed office as City Attorney in January 2003, payday lenders have no longer been permitted to participate in the Program. That decision was based, at least in part, on Mr. Pfeiffer's philosophical disagreement with the payday lenders' business model. Otherwise, the Program continues to function to this day.

**7.** Of the $460.00 due, $400.00 represented the principle amount borrowed and $60.00 reflected a "finance charge" charged by Check$mart for the loan. *Id.*

its representative of these facts and asked to make other arrangements for the repayment of the loan. The Check$mart representative refused. Plaintiff testified that, after speaking with that representative, she believed that Check$mart would press criminal charges against her—an event that, plaintiff feared, would result in the loss of custody of her children.

After plaintiff failed to repay the loan on May 8, 2002, Check$mart presented the post-dated check for payment, but the check was dishonored. Thereafter, plaintiff received a letter from Check$mart dated June 21, 2002. *Plaintiff's Trial Exhibit 20.* The letter advised that plaintiff now owed $485.00, which was due within ten days of receipt of the letter:

> **YOU ARE HEREBY ADVISED THAT** unless you pay the face value of the check(s) and all service charges within **TEN (10) DAYS** of the receipt of this **FINAL DEMAND** notice, the law presumes that you have written the check(s) with the knowledge that the check(s) would be dishonored. In order to resolve this matter within the **TEN DAY** period, and to avoid any possible legal action, you may direct payment in full or any questions that you may have, to this office without delay.

*Id.* (emphasis in original). Plaintiff did not pay the amount demanded.

### D. Plaintiff Receives Letters from the Program

On July 11, 2002, the City sent plaintiff a letter at her workplace indicating that a mediation with Check$mart had been scheduled, through the Program, for July

31, 2002, at 4:30 p.m. *Plaintiff's Trial Exhibit 5.* Plaintiff conceded at trial that this letter was not labeled a court summons, did not state that she had been charged with passing a bad check and did not threaten any legal action whatsoever. Nevertheless, plaintiff believed that the letter was a summons from a Columbus court, on behalf of Check$mart, to appear in connection with a criminal proceeding. Plaintiff based this belief on the appearance of the City Attorney's seal at the top of the letter, on the letter's reference to "Courtroom 4C," and on the first sentence of the letter, which stated that a complaint had been made against her. Plaintiff did not call Check$mart or the City to ask about the letter. She did not appear at the mediation scheduled for July 31, 2002.[8]

On August 6, 2002, the City sent a second notice to plaintiff, indicating that another mediation was to be held on August 14, 2002, in Courtroom 4C. *Plaintiff's Trial Exhibit 6.* The envelope in which that letter arrived reflected the return address, "[illegible] County Municipal Court." *Plaintiff's Trial Exhibit 7.* Plaintiff did not attend the second mediation.

## II. DISCUSSION

### A. FDCPA

#### 1. Whether the City Is a "Debt Collector" under the FDCPA

Plaintiff alleges that the City is a debt collector and that it violated the FDCPA in a number of respects in its operation of the Program. *See* 15 U.S.C. §§ 1692e, 1692f, 1692g, 1692i.[9] The FDCPA was designed

---

8. At some point after she had received this notice, plaintiff consulted an attorney in Zanesville, Ohio, who explained the mediation process and who assured her that she had not been summoned to a criminal proceeding. Plaintiff testified that, prior to that time, she had believed that she would be prosecuted for the dishonored check issued by her to Check$mart.

9. Briefly, plaintiff alleges that the City failed to meet the strict notice requirements of the FDCPA and collected or attempted to collect amounts not permitted by law. *Final Pretrial Order,* at 2.

to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). Under the FDCPA, a "debt collector" is defined as:

> [a]ny person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly, or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6).

■ The United States Court of Appeals for the Sixth Circuit has explained that this definition encompasses two mutually exclusive prongs:

> [I]t is clear that Congress intended the "principal purpose" prong to differ from the "regularly" prong of its definition of "debt collector." *See Garrett v. Derbes,* 110 F.3d 317, 318 (5th Cir.1997) (*per curiam*). Thus, one "may regularly render debt collection services, even if these services are not a principal purpose of his business." *Id.*

*Schroyer v. Frankel,* 197 F.3d 1170, 1174 (6th Cir.1999). A plaintiff pursuing a claim under the FDCPA bears the burden of establishing that the defendant is a debt collector within the meaning of the FDCPA. *See, e.g., Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti,* 374 F.3d 56, 60 (2nd Cir.2004).

In the case *sub judice,* there is no dispute that the City uses the mail in its Program.[10] Left for resolution is the question of the City's status as a debt collector within the meaning of the

FDCPA, *i.e.,* (1) is the "principal purpose" of the Program the collection of any debts owed to another, or (2) does the City, through its Program, regularly collect or attempt to collect, directly or indirectly, debts owed to another. The Court will address each prong in turn.

### a. Principal purpose

The FDCPA does not clearly define "debt collection." In the context of attorneys and law firms alleged to be debt collectors under the FDCPA, the United States Supreme Court looked to the purpose and intention of the actions taken by the alleged debt collector:

> In ordinary English, a lawyer who regularly tries to obtain payment of consumer debts through legal proceedings is a lawyer who regularly "attempts" to "collect" those consumer debts. *See, e.g.,* Black's Law Dictionary 263 (6th ed. 1990) ("To collect a debt or claim is to obtain payment or liquidation of it, either by personal solicitation or legal proceedings").

*Heintz v. Jenkins,* 514 U.S. 291, 294, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995). *See also Schroyer v. Frankel,* 197 F.3d at 1176 (same). Keeping this guideline in mind, the Court turns to the arguments and evidence in this case.

Plaintiff relies on several items of evidence in arguing that the "principal purpose" of the Program is the collection of debts owed to another. Plaintiff points, first, to the City's brochure which states that the "Program assists in the collection of money lost to merchants due to the passing of bad checks." *Plaintiff's Trial Exhibit 15.* Second, because a dishonored post-dated check issued to a payday lender could not form the subject of a criminal

---

**10.** The City did not dispute at trial that it may be considered a "person" under the FDCPA, nor did it challenge plaintiff's characterization of her transaction with Check$mart as a consumer debt.

prosecution of the consumer-issuer, the utilization of the Program by payday lenders did not serve a stated purpose of the Program, *i.e.*, to reduce the criminal docket of the Franklin County Municipal Court. Third, the City's efforts have resulted in payments of significant amounts to payday lenders in a substantial number of cases, as reflected in the City's own records. *Plaintiff's Trial Exhibit 14.* Finally, neither the consumer nor the payday lender attended the scheduled mediation if the amount allegedly due was paid prior to the scheduled date.

The City, on the other hand, denies that it is a debt collector within the meaning of the FDCPA. According to the City, the primary purpose of the Program is—not the collection of debts—but the mediation of disputes. In making this argument, the City points to its use during the relevant time period of outside, trained mediators and to the fact that the process did not always result in actual payment to the payday lender. In addition, the City's letters to the alleged issuer of the check, *see, e.g., Plaintiff's Trial Exhibits 5, 6,* did not accuse the consumer of criminal misconduct nor did those letters threaten criminal prosecution. Finally, the City argues that it is the actual operation of the Program—not isolated language in the City's brochure describing the Program, see *Plaintiff's Trial Exhibit 15*—that should be determinative.

■ The City's arguments are well-taken and the Court concludes that the Program's primary purpose was to attempt to resolve disputes through the process of mediation, not to collect debts. The City used independent, trained mediators who attempted to facilitate a resolution between merchants and alleged issuers of dishonored checks. Plaintiff presented no evidence that the mediators were anything other than neutral third parties who had no interest in any particular outcome other than resolution of the dispute on whatever terms the parties might mutually agree. Indeed, the alleged issuer was not even compelled to attend the mediation session or otherwise even participate in the process. Moreover, collection of the claimed debt was not a foregone conclusion, but simply one of a number of possible outcomes of the process. The fact that a scheduled mediation would not proceed where payment had previously been made does not amount to evidence of debt collection; that result was simply a logical consequence of the resolution of the dispute.

The informal resolution of these disputes serves the primary goal underlying the Program, *i.e.*, reducing the burden on court dockets. Ms. Williams testified that the City initially implemented the Program in order to reduce the number of criminal charges and merchant complaints. Plaintiff does not even suggest that the Program—at least as utilized by non-payday lenders—does not serve this primary purpose. Rather, plaintiff appears to invite the Court to carve out from the broader Program certain instances based upon a particular category of user, *i.e.*, payday lenders, and to conclude that—in those instances—the principal purpose of that sub-portion of the broader Program is debt collection. The Court declines plaintiff's invitation in this regard. In any event, Mr. Pfeiffer testified that the Program serves a broader purpose, *i.e.*, the resolution of disputes on mutually agreed terms, short of judicial action, whether criminal or civil. The fact that the City at one point extended the Program to payday lenders, notwithstanding the fact that dishonored post-dated checks issued to them would not be the subject of criminal prosecution, suggests that the principal purpose of the Program is to serve this broader purpose.

The isolated language in the City's brochure to which plaintiff refers does not change the Court's evaluation of the Program. *See Plaintiff's Trial Exhibit 15* ("The Check Resolution Program assists in the collection of money lost to merchants due to the passing of bad checks."). When determining whether debt collection is the Program's "principal purpose," the Court must consider the City's actual conduct; isolated language is not determinative. *Cf. Keele v. Wexler,* 149 F.3d 589, 595 (7th Cir.1998) ("[The FDCPA's] language focuses primarily, if not exclusively, on the conduct of debt collectors, not debtors."); *Abels v. JBC Legal Group, P.C.,* 229 F.R.D. 152, 155 (N.D.Cal.2005) ("The FDCPA regulates the behavior of collection agencies attempting to collect a debt on behalf of another."); *Ducrest v. Alco Collections,* 931 F.Supp. 459, 462 (M.D.La. 1996) ("The focus of this inquiry [determining whether the defendant has acted unscrupulously in attempting to collect a debt] is on the debt collector's conduct."). The evidence in the record persuades the Court that the City's conduct in scheduling and offering mediations did not amount to the collection of debts on behalf of payday lenders. Notwithstanding this inartful, isolated language in the City's brochure, this Court concludes that debt collection was not the primary purpose of the Program.[11]

The Program, which provides mediation services,[12] is simply not a debt collection service. The Court therefore concludes that the Program's primary purpose was to resolve disputes through mediation, not to attempt to collect debts on behalf of payday lenders.

### b. Regularly collects or attempts to collect

Similarly, there is no evidence that the City "regularly collects or attempts to collect" debts on behalf of payday lenders. As discussed *supra,* during the relevant time period, the City regularly scheduled mediations, not debt collection efforts, involving consumers and merchant creditors, including payday lenders. Accordingly, plaintiff cannot establish that the City is a debt collector under the alternate prong of 15 U.S.C. § 1692a(6).

### 2. Whether the City Violated the FDCPA even if It Is Not a Debt Collector

█ Plaintiff argues that, even if the City is not properly characterized as a "debt collector," this Court should nevertheless conclude that the City violated the FDCPA when it sent out misleading letters to plaintiff and members of the plaintiff classes. Plaintiff specifically argues that the letters sent by the City to plaintiff, and the reference in those letters to a "complaint" regarding a "dishonored Check(s)," *see Plaintiff's Trial Exhibits 5, 6,* were misleading because they created the false belief that the City is involved in collecting the debt allegedly owed to a payday letter. Plaintiff's argument is without merit.

The FDCPA makes it unlawful

to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such

---

11. For the same reason, the Court concludes that the City's reports measuring the Program's success in terms of money collected do not militate a contrary result.

12. Mediation has been defined as "[a] method of nonbinding dispute resolution involving a neutral third party who tries to help the disputing parties reach a mutually agreeable solution." *Black's Law Dictionary* 1070 (9th ed.).

creditor, when in fact such person is not so participating.

15 U.S.C. § 1692j(a). This provision of the FDCPA typically addresses the use by a creditor of a third party's letterhead in order to "'give[ ] the delinquency letters added intimidation value, as it suggests that a collection agency or some other party is now on the debtor's back.'" *Gutierrez v. AT & T Broadband, LLC,* 382, F.3d 725, 734–35 (7th Cir.2004) quoting *Nielsen v. Dickerson,* 307 F.3d 623, 633 (7th Cir.2002).

The letters sent by the City to plaintiff, *Plaintiff's Trial Exhibits 5, 6,* notified the recipient that a mediation had been scheduled. The initial letter even explained that a mediation "is an out-of-court meeting between you and the merchant to attempt to resolve this issue." *Plaintiff's Exhibit 5.* The letters did not demand payment; indeed, the initial letter contained the cautionary language: **"DO NOT SEND PAYMENT IN ANY FORM TO THE CITY PROSECUTOR'S OFFICE!"** *Id.* The consumer was advised that he or she could contact the merchant with any questions. *Id.*

Plaintiff testified that she believed that the first letter, *Plaintiff's Trial Exhibit 5,* was a summons to a court appearance in connection with a criminal prosecution. Plaintiff did not testify that she believed, based on the letters sent to her by the City, that the City was attempting to collect the debt allegedly owed to Check$mart. Under these circumstances, the Court concludes that even a least-sophisticated-consumer would not believe that the City was attempting to collect the debt of another. Certainly, there is no evidence whatsoever that the City designed, compiled and furnished these form letters *"knowing"* that the forms "would be used to create the false belief" that the City was participating in the collection of the payday lender's debt "when in fact [the

City] was not so participating." 15 U.S.C. 1692j(a) (emphasis added). Moreover, plaintiff has offered no evidence whatsoever that the City acted with intent to deceive or to intimidate. *See White v. Goodman,* 200 F.3d 1016, 1018 (7th Cir.2000) (noting that Congress' concern in enacting § 1692j was to prevent deception and intimidation that induced debtors to abandon legitimate defenses).

This Court therefore concludes that plaintiff has failed to establish a violation of 15 U.S.C. § 1692j(a).

**B. OCSPA**

The OCSPA makes it unlawful for a supplier to engage in an unfair, deceptive, or unconscionable act or practice in regard to a consumer transaction. O.R.C. § 1345.02; *Hanlin v. Ohio Builders and Remodelers, Inc.,* 212 F.Supp.2d 752, 755 (S.D.Ohio 2002). *See also, e.g., Thornton v. State Farm Mut. Auto Ins. Co.,* 2006 WL 3359448, at *8, 2006 U.S. Dist. LEXIS 83968, *24 (S.D.Ohio Nov. 17, 2006) (*"The OCSPA only applies to suppliers* who commit unfair or deceptive acts in connection with a 'consumer transaction.'") (citing R.C. § 1345.02(A) (emphasis added)). The OCSPA defines a "supplier" as a "person engaged in the business of effecting or soliciting consumer transactions, whether or not he deals directly with the consumer." O.R.C. § 1345.01(C). A "consumer transaction" is defined as a "sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise or an intangible, to an individual for purposes that are primarily personal, family, household, or solicitation to supply any of these things." O.R.C. § 1345.01(A).

█ In the case *sub judice,* plaintiff contends that the practice of charging the $3.00 administrative fee and the payday lender's returned check fee constitutes "a *per se* unfair and deceptive act" in violation

of the OCSPA. *Plaintiff's First Amended Complaint,* ¶¶ 95–97. Plaintiff also argues that the Court can conclude that the City is a "supplier" under the OCSPA even if it is not a "debt collector" under the FDCPA. According to the United States Court of Appeals for the Sixth Circuit, however,

> the requirements of the statutes are similar.... Thus, to determine whether Defendants are 'suppliers' under the OCSPA, this Court must ask essentially the same question that it must ask to determine whether Defendants are 'debt collectors' under the FDCPA: Did debt collection activities fall within Defendants' regular and usual course of business so that they were 'engaged in the business of' debt collection?

*Schroyer v. Frankel,* 197 F.3d at 1177. As discussed supra, this Court has concluded that the City, through its Program, regularly organized mediations and did not engage in debt collection activities. Accordingly, because the City is not a supplier, plaintiff's OCSPA claim must fail.

## C. Common Law Fraud

At trial, plaintiff's counsel argued that the City committed fraud because it offered its Program's services—which were intended to reduce the criminal docket of the local courts—to payday lenders even though the City knew that the consumer debtors could not be criminally prosecuted in connection with their dishonored post-dated checks. Plaintiff also testified that she initially believed that the City's letter was a summons from the City Prosecutor to appear in court in connection with a criminal prosecution.

■ In Ohio, the elements of fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to wheth-

er it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Groob v. KeyBank,* 108 Ohio St.3d 348, 357, 843 N.E.2d 1170 (2006) (quoting *Gaines v. Preterm–Cleveland, Inc.,* 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987)). In order to prevail on this claim, plaintiff must prove the elements of fraud by a preponderance of the evidence. *See, e.g., Household Finance Corp. v. Altenberg,* 5 Ohio St.2d 190, 192, 214 N.E.2d 667 (1966); *Cornwell v. N. Ohio Surgical Ctr., Ltd.,* 185 Ohio App.3d 337, 345–46, 923 N.E.2d 1233 (6th Dist.Ct.App.2009). A failure to establish any element is fatal to a claim of fraud. *See, e.g., Mussivand v. David,* 45 Ohio St.3d 314, 322, 544 N.E.2d 265 (1989) ("All elements must exist to show fraud.").

As an initial matter, the Court notes that plaintiff's initial factual allegations underlying this claim are directed not to the City but to the payday lenders, who have been dismissed as defendants in this case. *See Plaintiff's First Amended Complaint,* ¶¶ 101–110 (alleging, *inter alia,* wrongdoing based on the payday lenders' knowledge and intent and asserting that the payday lenders made false certifications to *the City* to induce *the City* to provide official authority to assist lenders in collecting debts). However, the City appears to concede that this claim has been asserted against it. *See Final Pretrial Order,* at 2.

■ Nevertheless, plaintiff has not established the elements of a fraud claim. Specifically, plaintiff has pointed to no false statement—whether made by a payday lender or the City—upon which plaintiff or a member of the classes relied. For example, the payday lender's utilization of

the Program—apparently at the City's invitation—certainly did not mislead the City. The City did not falsely represent its letters to be court summonses. The City accurately notified the recipient that a mediation, *i.e.*, an out-of-court meeting, had been scheduled to take place in the courthouse. The fact that plaintiff may have subjectively believed that she had been summoned to a criminal proceeding does not convert the City's accurate letters into false representations.

Moreover, there is no evidence that the City intended to mislead consumers into relying upon a representation that the consumers would be criminally prosecuted in connection with the dishonor of a post-dated check issued to payday lenders. Instead, the evidence established that the City intended to implement and maintain the Program—even as utilized by payday lenders—in order to reduce the burden on state court dockets.

Similarly, there is no evidence that plaintiff justifiably relied on any false representation. For purposes of a fraud claim, reliance is justified if the purported false representation "does not appear unreasonable on its face" and "if, under the circumstances," there is "no apparent reason to doubt the veracity of the representation." *Lepera v. Fuson*, 83 Ohio App.3d 17, 26, 613 N.E.2d 1060 (1st Dist.Ct.App. 1992). In making this determination, the Court may consider plaintiff's level of sophistication. *See, e.g., Russ v. TRW, Inc.*, 59 Ohio St.3d 42, 49, 570 N.E.2d 1076 (1991). Plaintiff, a high school graduate with some college education, is presumably literate; having purchased and sold three homes, she has had experience with complicated business documents. Plaintiff is therefore not without some sophistication. Regardless of the letterhead, the location of the scheduled mediation in the courthouse and the statement in the letters that a complaint had been made against plaintiff, the Court concludes that plaintiff's reliance on the City's letters to conclude that she had been summoned to a criminal proceeding was neither reasonable nor justifiable. Finally, plaintiff has not established any resulting injury. Because plaintiff has not established each of the elements necessary to her fraud claim, that claim must fail.

### D. Civil Conspiracy (O.R.C. § 2923.34)

█ At trial, plaintiff argued that the City violated Ohio's Pattern of Corrupt Activity Act, O.R.C. § 2923.34, because it worked in concert with payday lenders to collect fraudulent debts from consumers.[13] This Court disagrees.

In a civil action under O.R.C. § 2923.34, a person injured or threatened with injury by a violation of O.R.C. § 2923.32 may pursue a claim for relief from the person whose conduct violated § 2923.32 or the person who conspired to violate that section. Section 2923.32 provides that "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." § 2923.32(A)(1).[14] In order to prevail on a claim under § 2923.34, a plaintiff

---

**13.** Although *Plaintiff's First Amended Complaint* alleges additional activities, *i.e.*, "soliciting, procuring, and conspiring to engage in mail fraud and extortion; falsification of criminal complaints; theft by deception of money and of public services exceeding $500.00 in value; and tampering with records[,]" *id.* at ¶ 116, no reference to or evidence of these activities was presented at trial.

**14.** The term "person," as used in this statute, includes "any governmental ... entity." O.R.C. § 2923.31(G).

must prove, by a preponderance of the evidence,

> (1) that the conduct of the defendant involves the commission of two or more specifically prohibited state or federal criminal offenses, (2) that the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity [or the collection of an unlawful debt], and (3) that the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise that exists separate and apart from the defendant.

*Hall v. CFIC Home Mtg.*, 175 Ohio App.3d 587, 597, 888 N.E.2d 469 (12th Dist.Ct. App.2008) citing *U.S. Demolition & Contracting, Inc. v. O'Rourke Constr. Co.*, 94 Ohio App.3d 75, 83, 640 N.E.2d 235 (8th Dist.Ct.App.1994).

The term "corrupt activity" is defined by the statute as the violation of certain specified federal and state laws. § 2923.31(I). Violations of the FDCPA and the OCSPA are not among the lists of predicate acts that will qualify as "corrupt activity" for purposes of § 2923.32, nor is common law fraud. *See id.* An "unlawful debt" is defined as a "debt that is legally unenforceable ... because the debt [violates] any ... law relating to the business of gambling activity or relating to the business of lending money at an usurious rate...." O.R.C. § 2923.31(L).[15] The relationship between plaintiff and Check$mart did not involve a debt "relating to the business of gambling activity." *See id.* Although plaintiff clearly disapproves of the rate of interest charged her by Check$mart, and charged by payday lenders generally, plaintiff offers no evidence that those rates are usurious within the definition of § 2923.31(L).

For all these reasons, then, the Court concludes that plaintiff has failed to establish her claim under O.R.C. § 2923.34.

---

**15.** The Court notes again that this claim was directed in *Plaintiff's First Amended Com-*

## III. CONCLUSIONS OF LAW

This Court has jurisdiction over the claims asserted in this action. 28 U.S.C. §§ 1331, 1367. The Court is vested with jurisdiction over the parties.

The Court further concludes that, for the reasons stated *supra*, plaintiff has failed to establish her claims against the defendant City of Columbus. Specifically, the City is not a "debt collector" within the meaning of the FDCPA and did not otherwise violate the FDCPA. Similarly, the City is not a "supplier" within the meaning of the OCSPA. Finally, the City did not itself defraud plaintiff and did not conspire to engage in corrupt activity within the meaning of O.R.C. § 2923.34.

The defendant City is therefore entitled to judgment on the claims asserted against it in this action.

The Clerk shall enter **FINAL JUDGMENT** in favor of the defendant City.

---

*plaint* only to the payday lenders. *Id.*, ¶¶ 7, 111–118. *But see Final Pretrial Order*, at 3.